STATE EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, v. G. BRADFORD COOK, A MEMBER OF THE NEBRASKA STATE BAR ASSOCIATION, RESPONDENT.

232 N. W. 2d 120

Filed July 24, 1975. No. 39791.

Paul L. Douglas, Attorney General, and Melvin K. Kammerlohr, for relator.

Robert B. Crosby of Crosby, Guenzel, Davis, Kessner & Kuester, and Jonathan L. Rosner of Rosner, Rosner & McEvoy, for respondent.

Heard before WHITE, C. J., BOSLAUGH, NEWTON, CLINTON, and BRODKEY, JJ., and COLWELL and WARREN, District Judges.

CLINTON, J.

This is a disciplinary proceeding under the rules of this court brought by the State of Nebraska ex rel. Nebraska State Bar Association against the respondent, G. Bradford Cook, an active member of the bar of this state, who, at the time of the offenses charged, resided in Washington, D.C., and who earlier had practiced law in the city of Chicago, Illinois.

These proceedings were instituted on April 1, 1974, as a consequence of a complaint made by an active member of the bar of this state to one of the standing Committees on Inquiry previously appointed pursuant to our rules. The complaint called attention to newspaper articles of March 29 and 30, 1974, which recited alleged admissions

of previous perjury and lying made by the respondent while testifying as a witness for the United States in the prosecution of John Mitchell and Maurice Stans in the United States District Court for the Southern District of New York on charges of obstruction of justice and conspiracy. The charges against Stans and Mitchell were related to the investigation by the Securities and Exchange Commission of Robert Vesco.

On August 5, 1974, this court, by order, transferred the complaint to the Advisory Committee of the Nebraska State Bar Association. The Advisory Committee held a hearing on September 11, 1974, at which the respondent appeared and at which evidence was received. The Advisory Committee concluded that there was reasonable ground to believe Cook guilty of the charges and filed its complaint in six counts against the respondent in this court on September 27, 1974. On November 8, 1974, John H. Kuns, District Judge, Retired, was appointed by this court as referee to take testimony on an amended complaint. The amended complaint charged that the respondent Cook violated DR 1-102 (A) (3), (4), (5), and (6) in the respects charged in the following counts:

Count I: That respondent knowingly testified falsely under oath before a Grand Jury of the United States District Court for the Southern District of New York in the matter of the United States v. Robert Vesco, on April 19, 1973.

Count II: That in the same proceeding in the same court, respondent again knowingly testified falsely under oath on May 3, 1973.

Count III: That in the same proceeding in the same court, respondent again knowingly testified falsely under oath on May 7, 1973.

Count IV: That respondent knowingly testified falsely before Senator Proxmire's Subcommittee on Appropriations for the Department of Housing and Urban Development, Space Science, Veterans and Certain Other Inde-

pendent Agencies of the Committee on Appropriations on May 1, 1973.

Count V: That respondent knowingly testified falsely under oath before the same subcommittee on May 14, 1973.

Count VI: That respondent knowingly testified falsely under oath before Representative Staggers' Special Subcommittee on Investigation of the Committee on Interstate and Foreign Commerce, on May 21, 1973.

Respondent, by his amended answer, admitted that as to count I of the complaint: "Respondent on April 19, 1973, knowingly testified inaccurately, incompletely, evasively, and in some respects falsely under oath before the Grand Jury in the United States District Court for the Southern District of New York in the matter of United States v. Robert Vesco." Respondent denied all remaining allegations of counts II to VI.

By written stipulation the respondent expressly waived the lack of specificity in the description in the complaint of the alleged untruths.

The matter was heard by the referee on January 16, 1975. The referee found the respondent had admitted his guilt of count I; found that the evidence was insufficient to support a finding of guilt on counts II to VI, inclusive; made findings in extenuation of guilt on count I; and recommended discipline of censure or reprimand by this court. The relator filed exceptions to the findings of the referee on counts II to VI and to the recommended discipline. This court then heard the matter upon the combined evidence received by the Advisory Committee and the referee. We sustain the findings of the referee of guilty on count I and not guilty on counts II, III, and VI, and make findings of guilty on counts IV and V. We enter judgment of suspension from the practice of law for a period of 3 years.

The complaint is founded upon the theory that the respondent violated the disciplinary rules contained in

the Code of Professional Responsibility, Canon 1, in DR 1-102 (A), which provide:

"(A) A lawyer shall not: . . .

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

The burden rests upon the relator to establish each count of the complaint to a reasonable certainty by a clear preponderance of the evidence. State ex rel. Nebraska State Bar Assn. v. Rhodes, 177 Neb. 650, 131 N. W. 2d 118. An attorney may be subjected to disciplinary action for conduct outside the practice of law or the representation of clients, and for which no criminal prosecution has been instituted or conviction had, even though such conduct might be found to have been illegal. State ex rel. Nebraska State Bar Assn. v. Tibbels, 167 Neb. 247, 92 N. W. 2d 546; State ex rel. Nebraska State Bar Assn. v. Butterfield, 169 Neb. 119, 98 N. W. 2d 714.

In this case the respondent admits having testified falsely at the April 19, 1973, hearing before the Grand Jury of the United States District Court for the Southern District of New York in the matter of the United States v. Robert Vesco, both by his amended answer and in his testimony. There is, therefore, no question but that count I of the complaint has been established.

We deem that a recital of some of the background information and the circumstances surrounding the alleged misconduct is essential to an understanding both of the justification for the discipline we impose and the findings we make as to the respondent's guilt insofar as those findings differ from those of the referee.

Respondent was admitted to the bar of Nebraska in 1962 and his membership has continued until the present time. Shortly after his admission in this state he began the practice of law in Chicago, Illinois, and specialized in securities law. In September 1971 he became general counsel for the Securities and Exchange Commission and in November 1971 assumed supervision of the investigation of Robert Vesco in connection with violations of federal statutes regulating securities. In August 1972 while that investigation was still in progress, Cook was appointed Director of the Division of Market Regulation of the commission. As director he no longer had direct responsibility for the investigation of Vesco, but was kept advised of developments. The present charges grow out of certain of the respondent's conduct related to that investigation and the subsequent prosecution of Maurice Stans.

In August of 1972 the investigation of Vesco developed information indicating that Vesco had "looted" a mutual fund known as Investors Overseas Services of the sum of about $250,000,000 and the SEC probe was then directed to efforts to determine exactly how and by what means this had occurred, where the funds had gone, and to the taking of appropriate legal action. In October of 1972 the SEC learned of $250,000 in cash having been delivered to Vesco in New Jersey. This transaction had apparently occurred in April of 1972. It also learned that $50,000 of this amount was at that time siphoned off and the balance of $200,000 had gone to some unknown destination or recipient. At about that time the Committee to Reelect the President, sometimes referred to as "CREEP," reported a contribution from Vesco of $50,000. Cook suspected at the time the SEC learned of the $250,000, and without having any direct evidence, that the $50,000 was a part of the looted funds. He further suspected that the $200,000 also might have become a political contribution. He mentioned his hunch to one member of the enforcement division of the SEC,

but that person indicated he had information that the money had probably gone to Vesco in the Bahamas.

On Saturday, November 11, 1972, the respondent went goose hunting at Eagle Lake near Houston, Texas. There Cook met Maurice Stans for the first time. The outing had been arranged by Cook's father, who was a friend of Stans through work done together in connection with the 1968 and 1972 political campaigns of Richard Nixon. At that time Stans, a former Secretary of Commerce in the Nixon administration, was chairman of a section of CREEP responsible for raising funds. The following outline of events at Eagle Lake and those which subsequently followed comes in part from an affidavit made on May 23, 1973, by the respondent while he was cooperating with the United States District Attorney in the prosecution of Mitchell and Stans, and in part from his testimony in these disciplinary proceedings and the evidence adduced in these proceedings. In the affidavit Cook stated: "I went to this goose shoot in part to meet and socialize with Maurice Stans and other individuals who could be helpful in my efforts to seek the chairmanship of the SEC." In the course of a conversation at Eagle Lake, the respondent mentioned to Stans his desire to become chairman of the SEC when the present chairman, William Casey, quit, which event the respondent believed to be imminent. Some further discussion ensued between Cook and Stans during which Stans indicated he favored an accountant for the position. Cook urged reasons supporting the proposition that a securities lawyer should be appointed and particularly urged his own qualifications. Stans made no commitment. Later, in the same conversation, Cook brought up the matter of the Vesco investigation and mentioned in particular the $250,000 cash fund and noted the receipt of the $50,000 by CREEP from Vesco. Stans indicated he had no knowledge of the contribution. Cook asked him to check on it. Cook, in his testimony, stated that his purpose was to discover if CREEP might

also have received the $200,000 and also apparently to give Stans an opportunity to make the information public if CREEP had, in fact, received the money. During the conversation Cook also mentioned that the complaint against Vesco would shortly be filed. When, at the end of the hunting outing, Cook and Stans parted at the Houston airport, Stans stated he would check on the Vesco contribution and get back to Cook, and, according to the affidavit, "In the same conversation I also recall Mr. Stans making some mention of the SEC chairmanship and that I should proceed in seeking it."

On November 13, 1972, when Cook returned to his office in Washington, D. C., he received, apparently routinely, a copy of a draft of the proposed complaint against Vesco. It contained a paragraph outlining in some detail the movement of the $250,000 cash. Previous drafts of this particular paragraph had been in very general language, omitting dates, amounts, and identity of persons. In the draft then before him Cook noted that a certain date coincided with the last day in the preceeding April during which cash political contributions could lawfully be made without being publicly reported.

On November 15, 1972, Stans called Cook and indicated he wanted to talk "about what we discussed at Eagle Lake." Cook then brought up the Vesco investigation and paraphrased to Stans the allegations of the paragraph. Stans indicated the pleading gave him problems and wondered if it had to be done that way. Cook told Stans he did not know, but would find out. Then Cook spoke to a Mr. Stan Sporkin of the SEC enforcement staff, who was one of the persons then having prime responsibility for the projected litigation against Vesco. Cook's affidavit, insofar as it pertains to that particular matter, is as follows: ". . . asked him why this particular paragraph was in the complaint and whether it was necessary to our case. He stated that it had to be in the complaint. I then asked him

if it was necessary to have such great detail. I expressed my opinion that it would be more professional and better style to have a general description of this particular transaction. I believe he took the particular paragraph on a single sheet of paper from my hand, glanced at it and said to the effect that he would see what he could do to make it more general and left for his office."

The affidavit of Cook also recites: "Following my conversation with Mr. Sporkin I recall some discussions of this paragraph with Mr. Casey. I believe that I expressed to Mr. Casey my concern over the paragraph as originally drafted. I told him that I had discussed it with Sporkin and that Sporkin was going to redraft the paragraph to be more general. He in effect asked me to work it out with Stan Sporkin. I also believe that he made a comment to the effect that our primary objective was to stop Vesco from looting the IOS funds and the complaint should be worded to accomplish this objective and that we should not detract in any way from the main focus or thrust of our case. I have some recollection of stating that the paragraph may have political overtones."

On November 17, 1972, Cook called Stans and told him the paragraph had to stay in the complaint, but would be pleaded in a more general way without the specifics. Stans expressed the opinion " 'that's better'," or " 'that's fine'." Cook went on to tell him that transcripts of discovery depositions of witnesses would be filed and that when that was done all the information the SEC had on the $250,000 transaction would be on public record. Stans inquired as to why that needed to be done. Cook said he did not know, but would find out. Cook then again conferred with Sporkin. On November 27, 1972, the complaint against Vesco was filed. The transcripts were later filed and Stans ultimately became aware of that fact.

On February 1, 1973, Stans called Cook and asked him to meet him at the White House Mess. At that

time Stans showed Cook a copy of a transmittal letter to Vesco, returning a $250,000 political contribution. Stans said no announcement would be made, but, because of the size of the contribution, the matter would become public when the GAO filed its report (apparently upon audit under the Disclosure Act). Cook testified during the disciplinary proceedings that, up until the time of this disclosure by Stans, he had believed CREEP had not been the recipient of the $200,000 because of Stans' implicit denial, and that this belief had, despite his initial suspicions, been reenforced by Sporkin's statement that the money had gone to the Bahamas. The day following the meeting with Stans at the White House Mess, Cook notified Sporkin of Stans' disclosure. Later Cook contacted Stans urging the matter be made public, and the latter indicated to Cook that there would be no disclosure until the GAO filing. On March 3, 1973, Cook became Chairman of the Securities and Exchange Commission.

Such is a sketchy summary of the pertinent background. We now turn to the events directly pertaining to the offense charged.

While the previously cited events were occurring, a Grand Jury of the United States District Court for the Southern District of New York was investigating the charges against Mitchell and Stans. In February or March 1973, Cook turned over to the United States District Attorney's office, at its request, some documents which presumably would be useful in the Grand Jury probe. These items included "logs, telephone books, calendars and some memoranda and correspondence." Shortly thereafter, Cook, at Stans' request, again met Stans at the White House Mess. The request for the meeting was made apparently by telephone and Stans, either then or at the beginning of the meeting, stated that he wanted it to be "One of those conversations that does not take place." At this meeting Stans informed Cook that he had testified before the Grand

Jury and that in that testimony had stated that he had no communication with Cook regarding the Vesco investigation *until after* the complaint against Vesco had been filed. At the trial of Mitchell and Stans, Cook testified concerning this meeting as follows: "And he said that in connection with our meeting at that time, that the meeting would be—it was being held to discuss a trip to Haiti which both he and myself had been invited to attend.

"Q Was there any further conversation?

"A I looked at Mr. Stans, or actually I looked into my coffee cup, and I said, 'Well,' and I kind of hesitated, and he said, 'Well, Brad, that's the way it happened, and there is no sense in getting everybody embarrassed here. There was nothing done wrong here. The gift was a legal gift. Your suit was brought and all it would do is cause a great deal of embarrassment to everybody.'

"Q What did you say?

"A I said, 'Well, if that's the way it is going to be, I guess that's the way it is going to be,' or words to that effect.

"Q Was there any further conversation that day?

"A I believe that was the substance of it."

Apparently, earlier in February 1973 previous to the meeting with Stans we have just described and before Cook had assumed his duties as Chairman of the SEC, he had received a request from Kenneth Parkinson, attorney for the fund-raising section of CREEP of which Stans was the head, to meet Parkinson at the latter's office. There Parkinson informed Cook that he had received from Stans some notations of meetings between Stans and Cook and he wanted to go over them with Cook to verify the information therein. As indicated by the memoranda, as related by Parkinson to Cook, these meetings between Cook and Stans were said to have taken place *after* the filing of the Vesco complaint. According to Cook's testimony before the referee: "And he gave me a piece of paper which had various dates

written, and he went through each date and he said 'Well, Mr. Stans said that he talked to you on this date about this matter, and on this date about this matter.' And on one or two of the dates I corrected him on the date itself, and on the, with respect to the discussions that took place and what the subject of those discussions were. I didn't say yes, I didn't say no, I just sat there and didn't correct Mr. Parkinson."

On April 19, 1973, Cook appeared before the Grand Jury and, as he judicially admits, knowingly testified falsely that he had no conversation with Stans concerning the Vesco complaint until after the complaint was filed.

On May 1, 1973, Cook, as Chairman of the SEC, together with other members of the staff of that agency, were testifying before a subcommittee on appropriations of the United States Senate headed by Senator Proxmire. The subject was the SEC budget. Those testifying were not under oath. After the testimony on budget matters was concluded, Senator Proxmire brought up the subject of the Vesco investigation. After an introductory question and answer by Cook, the following occurred: "Senator Proxmire. Well, the reason I asked this question is I want to know whether any member, any Commissioner or any staff member could tell us this morning whether they have been approached by anyone in the administration with respect to activities of the SEC vis-a-vis Vesco. Why don't we just go through the Commissioners?" Each of those witnesses testified negatively until Cook was reached and he responded as follows: "Mr. Cook. Both before and after our suit was filed I had discussions concerning a particular facet of the case with a member of the Re-Election Committee. These discussions focused in general on the source of a large sum of cash which was ultimately described in paragraph 64 of our complaint. The first discussion arose in the context of a social gathering.

"Senator Proxmire. Who was the member?

"Mr. Cook. It was Maurice Stans.

"Senator Proxmire. What were the dates of these discussions?

"Mr. Cook. I couldn't give you specific dates but it would have been immediately before the complaint was filed in November and subsequent discussions were held in January."

In the brief of respondent, our attention is called to the fact that the question asked was irrelevant to the subject of inquiry of the committee and could have been truthfully answered by Cook in the negative since, at the time of the various conversations between Stans and Cook, the former was not a member of the Nixon administration, but one of the members of the CREEP committee. It is to be noted, however, that the response was in fact a coverup of the falsity of some of the items concerning which Cook had lied before the Grand Jury and would therefore appear to be at least a volunteered continuation of the original lie. The untruth evident here is that the answer limits the subject of the conversation to the source of the funds, whereas the incriminating conversations were those relating to restricting the pleading and the feasibility of not filing certain discovery depositions. It also lies in the fact that *all* these conversations took place *before* the filing of the complaint. In his later and second appearance before the Proxmire committee on May 14, 1973, the respondent acknowledged the knowing falsity of his statement of May 1, 1973, in the following exchange: "Senator Proxmire. So you knew at the time you made the response it was not true?

"Mr. Cook. I knew at the time I made the response here on that day it was not true and, again, as soon as I got back, when I got back, on Friday when I saw the transcript I immediately tried to reach you and to tell you."

On May 2, 1973, the day following the Proxmire subcommittee budget hearing, Cook received a telephone

call from Mr. Seymour, United States District Attorney for the Southern District of New York, inquiring whether Cook would be coming to New York within a few days as there was a very important matter concerning which he wished to speak to Cook. Cook responded that he would be in New York that evening to make a speech and would see the District Attorney that afternoon. At the hearing before the referee in which Cook described this telephone conversation, he stated he felt that he knew what the District Attorney had in mind and was anxious to discuss it with the District Attorney. Cook kept the appointment and was there told, in Mr. Cook's words: "Seymour said that they had reason to believe that my Grand Jury appearance on the 19th, my testimony had not been completely truthful.

"And I said to him I was relieved that he had raised this question and that, and that he was correct, that I had not leveled with the prosecutors and that I would do everything in my power to tell him everything that I could recall concerning these, this investigation."

Cook appeared before the Grand Jury on May 3, 1973, and testified. He was recalled for further testimony before the same Grand Jury on May 7, 1973. Between these two Grand Jury appearances Cook, after being unable to contact Senator Proxmire by telephone, wrote a letter to Senator Proxmire in which he stated: "In my response I interpreted the question in the spirit I thought it was asked and recounted a conversation that I had with Mr. Stans even though at that time he was not a member of the administration.

"While that conversation was the one which most readily came to mind at the time, I was mistaken in indicating that it had occurred subsequent to the filing of our law suit.

"It is my recollection that the conversation occurred prior to the date on which we brought our case. In addition, there were several other conversations which I had with Mr. Stans, both prior and subsequent to the

filing of our law suit." We observe that the acknowledgement in this letter is not one of having told a falsehood, but merely one of being "mistaken."

On May 10, 1973, Vesco, Mitchell, Stans, and others were indicted.

On May 14, 1973, Cook was called to testify again before the Proxmire subcommittee and at this time he did testify under oath. A principal subject of inquiry at this hearing was whether the generalized, rather than particularized, pleading of the paragraph in the SEC complaint against Vesco was motivated merely by the legal appropriateness of the method of pleading, or whether it was motivated by desire either to conceal or delay disclosure of the information. This same matter was also a matter of critical importance in the prosecution of Stans. In that connection Cook testified contradictorily as to whether he had discussed the pleading of that paragraph with Sporkin before or only after his conversation with Stans on November 15, 1972. The thrust of the inferences to be drawn are that if he discussed the matter with Sporkin on November 14, 1972, then the changes in the pleading were not motivated by Stans' importunations and, on the other hand, if he did not discuss it with Sporkin until after the conversation with Stans, then the opposite could be concluded. (We note here parenthetically and for the purpose of the clarification of later comments in the opinion that the issue raised by the paragraph in question is the one under which evidence of the $250,000 Vesco cash, which ultimately found its way to CREEP, would be admissible in evidence in the case against Vesco.)

In an affidavit prepared between May 17, 1973, and May 23, 1973, and signed on the latter date, during the time while Cook was cooperating with the United States District Attorney, Cook stated: "Following this conversation with Mr. Stans, I spoke to Sporkin and asked him why this particular paragraph was in the complaint. . . . ." At the Mitchell-Stans trial on cross-examination,

Cook acknowledged unequivocally that the conversation with Sporkin came after the conversation with Stans. That testimony was as follows: "And directing your attention to the date November 14 of 1972, when you returned to the SEC from your goose hunt, is it not a fact that you found paragraph 33A, so to speak, before you for the first time?

"A That's my best recollection, Mr. Bonner.

"Q And that was a day before your telephone conference with Maurice Stans on November the 15th, is that not so?

"A Yes, sir.

"Q And is it not a fact that a day prior to ever speaking to Maurice Stans on May [sic] the 15th, you talked to Sporkin about this paragraph on the 14th?

"A That's not a fact, Mr. Bonner. . . .

"Q And that on May 14th, 1973, before the Senate Committee, before Senator Proxmire and Senator Brook, you stated on three or four or five different occasions that the decision not to use the expanded paragraph was made by you in consultation with Mr. Sporkin on November 14th?

"A Essentially, that's correct, Mr. Fleming." Respondent, at the Mitchell-Stans trial, acknowledged that his testimony before the Proxmire committee on May 14, 1973, had been false in that respect. A part of that testimony, as shown in the record of that hearing, is as follows: "Mr. Cook. All I can do is look at the memoranda that set the complaint down and stated the 13th of November. And I have on my calendar a meeting with Mr. Sporkin on the 14th. I assume it was that conversation in which we talked about this. And I had the conversation with Mr. Stans on the 15th. I can't be specific. I just don't know." At the committee hearing on May 14, 1973, Cook was also interrogated to a considerable extent concerning the motivation for his inquiries or suggestions to Sporkin with reference to not filing the transcripts of testimony of the discovery

witnesses. He at that time attributed those inquiries or suggestions to his independent judgment and not to the importunations of Stans. Sporkin testified before the Proxmire committee that Cook indicated to him he would be "appreciative, if the transcripts that dealt with the $250,000 were not filed if they did not have to be filed at that time." The conclusion that Cook's suggestion relative to amending the pleading and against filing the transcripts was motivated by his prior conversations with Stans is inescapable.

On May 16, 1973, Cook resigned as Chairman of the SEC. On May 21, 1973, he testified before the Staggers committee.

We have carefully read the testimony of Cook before the Grand Jury on May 3 and 7, 1973, and his testimony before the Staggers committee, just as we have read the testimony in the other proceedings. The relator has not pointed out the specific testimony in those hearings which it claims is knowingly untruthful. Our reading of the testimony of those three hearings and comparing it with the facts stated in Cook's affidavit and his testimony at the Mitchell-Stans trial has uncovered no testimony which we can conclude is untruthful.

To lie is to make an untrue statement with intent to deceive. Webster's Third New International Dictionary, Unabridged. Even though a statement as to the truth of a fact is mistaken, the statement is not a lie if the sayer himself honestly believes it to be true. The relator, in support of its contention that the respondent lied before the Grand Jury on May 3 and 7, 1973, and before the Staggers committee on May 21, 1973, relies principally upon the seemingly unequivocal admissions of the respondent made on cross-examination during the Mitchell-Stans trial that he had lied on those occasions. The respondent, in his testimony before the referee, explains these admissions made during the Mitchell-Stans trial in the following manner. During a recess after the admissions were made, he had a conversation

with one of the prosecutors. We now quote from the hearing before the referee: "A Well, I was disturbed because I had admitted on cross-examination concerning the truthfulness of prior testimony and the term perjury and the word lied, and I said that I really wasn't given an opportunity to explain those answers.

"I also said that many of the questions that I had been, especially Mr. Fleming was asking me, I had never been asked before, and that it made me appear as though I was in fact lying and had lied on many occasions, and I thought that had an adverse effect upon my personal integrity and credibility, and also was detrimental as far as the jury was concerned.

"You [Mr. Rosner] said that you'd make a list and that you had a list that had been made up of various sections, that you wanted them on redirect permit me to explain exactly my answers, why I said 'Yes, yes, yes.' especially to Mr. Bonner.

"Mr. Wing said that he was so pleased with my direct examination and that my credibility was such that he thought that all it would do would confuse the jury, the jury would know my own prior direct testimony, and that he did not want to go back and reconstruct each of these issues. He did say that he would ask me the one question, actually two questions, one, had I been asked all these questions before, which he did; and also permit me to say, which I was directing towards the April testimony, as to why I might have lied or why I did lie at that time, and that's the way it was left."

He was asked to explain his state of mind while undergoing cross-examination at the trial. "A The first time that Mr. Fleming, I believe he used the word 'perjury,' before I answered I looked at Mr. Wing hoping that, assuming that he would object. I then looked at Mr. Rosner, and there was a pause, a hesitation, and I thought at that time that the, the only answer under those circumstances could have been 'Yes.'

"Now in respect to Mr. Bonner, when he was going to

the first, the second, the third, the fourth time at the end of his cross-examination, I again said 'Yes,' or 'That's correct,' I believe. I had no idea at that time what the consequences would be of those admissions which I feel really are not admissions in the sense that, yes, I lied, yes, I perjured, other than for the April date.

"But what I was really trying to say to them and what I tried to explain to Mr. Wing during the recess and what I tried to explain to Mr. Bonner and Mr. Fleming once or twice on cross was that each time after May 2nd that I gave sworn testimony additional facts were coming out. And even the affidavit itself which took four or five days to execute still does not have complete truth, and even today as I testified here this morning I recalled Mr. Sporkin's comment to me after I testified in the May 14th Proxmire Committee, where he said that was a helluva question to ask at a budget hearing.

"And each time that I do review these things I do think of some little fact which comes out which makes the truth more complete each time. And that's what I in myself felt when Mr. Bonner and Mr. Fleming were asking 'Did you tell the whole truth?'

"The answer would be 'No, I did not tell the whole truth.' On many occasions I wasn't given the opportunity to tell the whole truth. The people who were asking the questions didn't want the whole truth as that existed, nor did I recall the whole truth. That's what I meant when I made the admissions to Mr. Bonner and to Mr. Fleming."

We accept, as did the referee, the respondent's explanation insofar as his admissions of lying relate to the May 3 and 7, 1973, Grand Jury appearances and the Staggers committee appearance. An examination of the respondent's testimony at those three hearings discloses at most variances concerning dates, whether a particular thing was said at one time or another, and summaries of conversations which differ in language or completeness

but not in substance. We believe the record shows the respondent did not lie on those occasions. Accordingly, there is no occasion to decide whether guilt of lying or perjury may be founded *solely* upon an extrajudicial admission without some other evidence of such conduct.

The respondent argues that censure or reprimand is, under the circumstances, a sufficient sanction for his admitted misdeed and any others of which the court may find him guilty. In support of this position respondent urges (paraphrased by us): (1) He made an early and complete disclosure and thereafter fully cooperated with responsible authorities. (Attested by letter from the prosecutor.) (2) He is a relatively young man who occupied a sensitive position in a governmental agency, and was subject to the direction of persons senior to him in age and experience and closely identified with the highest civil authority in the nation. (3) His conduct was an isolated transgression involving essentially a single course of conduct in an otherwise unblemished career. (His record of previously high ethical standards as well as his present high legal competence is attested by witnesses and numerous letters from persons of good repute.) (4) He was motivated simply by desire not to injure Maurice Stans. (5) The office of the United States District Attorney, with whom the respondent cooperated, believed his cooperation with that office was complete and forthright. (Attested by letters from the United States District Attorney.) (6) Only two persons could testify as to what occurred in the conversations between Cook and Stans and, if Stans persisted in his version (as he did), Cook could have probably succeeded, had he so wished, in concealing the evidence from the government, but he did not seek to do so. (Attested by letter from the United States District Attorney.) Accordingly, he might have been better off if he had not admitted his involvement, which he nonetheless did to his personal detriment. (7) Cook cooperated without seeking or having been promised immunity on the charge

of perjury. (Attested by letter from the United States District Attorney.) (8) He voluntarily resigned as Chairman of the SEC. (9) The publicity and humiliation attended upon Cook's disclosures and resignation are, in themselves, substantial punishment. (10) His continuation in the practice of law does not, under the circumstances, constitute a risk to clients, the public, or the administration of justice. (11) The untruths, whatever they may have been, hurt no individual and did not result, and were not intended to result, in the obstruction of justice. (12) Certain other lawyers involved in recent national scandals have been lightly dealt with. (13) He did not seek to plea bargain with either the District Attorney or the Watergate Special Prosecutor's force, and decisions by those offices not to prosecute Cook either for perjury or conspiracy to obstruct justice were based respectively on policy consideration to encourage recantation and on the merits. (Attested by letters from those offices.)

The determination of what is appropriate discipline in this case is not without difficulty. Many matters must be considered. These include the nature of the offenses, the need for deterrence of similar future misconduct by others, maintenance of the reputation of the bar as a whole, protection of the public and clients, the expression of condemnation by society on moral grounds of the prohibited conduct, and justice to the respondent, considering all the circumstances and his present or future fitness to continue in the practice of law. Drinker, Legal Ethics (1963), pp. 48, 49; State ex rel. Spillman v. Priest, 123 Neb. 241, 242 N. W. 433; In re Dreier, 258 F. 2d 68; State ex rel. Nebraska State Bar Assn. v. Butterfield, *supra*; State ex rel. Nebraska State Bar Assn. v. Mathew, 169 Neb. 194, 98 N. W. 2d 865; State ex rel. Nebraska State Bar Assn. v. Strom, 189 Neb. 146, 201 N. W. 2d 391.

The offense of perjury is most serious, tending, as it clearly does, to defeat the administration of justice

and is always held to be ground for either disbarment or suspension. Matter of Sleeper, 251 Mass. 6, 146 N. E. 269; State ex rel. Nebraska State Bar Assn. v. Butterfield, *supra*. The record discloses that the offense under count I was a premeditated perjury, committed at the solicitation of a highly placed political figure from whom respondent had sought political favor. The lie before the Proxmire committee was essentially a spontaneous occurrence and a continuation of the original lie. The two, for purposes of discipline, may be regarded as one offense. The lie before the Proxmire committee on May 14, 1973, pertaining basically to the respondent's motivation for his suggestion of changes in the Vesco pleadings, seems to have a slightly different genesis and motivation, and appears in part, at least, to have arisen from the self-delusion to which even the best of men are sometimes susceptible. Not infrequently a particular action may be the consequence of diverse motivations, some of which may be unworthy or morally wrong and the others quite proper. After the fact there is a very human tendency, founded in part on the frailty of memory, to attribute one's actions to the more worthy motive. That may be true in this instance. At one point in his testimony Cook described a conversation with the prosecutors in which he, at that time, believed he recalled that he did, in fact, have a conversation with Sporkin relative to the pleading change even before he talked to Stans on November 15, 1972. When Cook was testifying before the Proxmire committee on May 14, 1973, on the line was his position as chairman of the commission. He could not yet then bring himself to admit that the conversation with Sporkin had not taken place until after the conversation with Stans.

We observe, because it is a circumstance surrounding the offenses which affect their gravity, that the record does not support any inference that Cook's actions, relative to the pleadings, were intended to obstruct justice. It is clear that this was not his intention as he, at all

times, realized that the same evidence was admissible whether the matter was pled generally or specifically. He had no control over what evidence would be presented, and he knew as well that his colleagues in the enforcement division of the SEC fully intended to bring the $250,000 transaction to light. It would appear that what Cook desired was to cooperate with Stans in postponing a politically embarrassing disclosure. Cook did not then know of evidence, later coming to light, which indicated that other high-placed persons in the Nixon administration were attempting to exert influence upon the SEC to quash the Vesco litigation.

It is true that Cook made an early and ultimately complete disclosure and cooperated thereafter with the United States District Attorney. The disclosure, however, did not come until he was confronted with the accusation that he had lied. To his credit, however, it appears that his confession came with a sense of relief and that his wrong had weighed heavily upon his conscience.

Most of the specific items urged by Cook, as listed above, in favor of light discipline are either shown by the record or may be conceded, except insofar as our recital of the facts or comments have otherwise indicated. However, some others are deserving of special comment. One such item is the assertion that his acts hurt no one. This may be true as far as individuals are concerned. It may not be true as it relates to the administration of justice. Cook was a principal witness against Stans. His having to admit before the jury in the Mitchell-Stans trial that he had earlier perjured himself on the same matter concerning which he was then testifying could not but affect his credibility with that jury. Whether the result was a miscarriage of justice need not and cannot be judged for the whole record of that trial is not before us. Suffice it to say that his admitted perjury may well have affected his credibility and so, as a consequence, the administration of justice.

The fact that certain lawyers in other jurisdictions may have been lightly dealt with can be no consideration with this court. We are responsible for the discipline only of members of the bar of this jurisdiction and must adhere to disciplinary standards we believe appropriate.

The misconduct of respondent was not done at the behest of his superiors, but at that of a political figure having no official connection with the SEC.

It is clear from the record that Cook has previously observed high ethical standards in the practice of law and that his reputation in this respect, as well as professional competence, was excellent. Devious means do not appear to have been a way of life with him. The evidence of those who know him tends to show great honesty and fairness. Evidence in the record supports the conclusion that he is sincerely contrite for the offenses committed by him. This, indeed, the record indicates, is in part responsible for his perhaps too ready admissions that he was not truthful in his appearances of May 3 and 7, 1973, before the Grand Jury and later before the Staggers committee.

A judgment of permanent disbarment is a most severe penalty, as anyone who is dependent upon some special skill or knowledge for his own livelihood will quickly recognize if he contemplates for a moment the impact of being deprived by judicial fiat of the use of that skill and knowledge. Disbarment ought not to be imposed for an isolated act unless the act is of such a nature that it is indicative of permanent unfitness to practice law.

The nature of the acts here do, however, go to the heart of the administration of justice. We are, nonetheless, persuaded that there is no likelihood of repetition of this or any other unlawful or unethical conduct. Mere reprimand or censure, however, cannot, we believe, accomplish the multiple purposes of discipline as we have previously outlined them. Under all the circumstances,

we find that the respondent should be suspended from the practice of law for a period of 3 years, provided that at the end of that period the suspension may be lifted upon an affirmative showing by him that he has not, during the period of his suspension, engaged in the practice of law in any manner whatsoever in this or any other jurisdiction and that he has not, during that time, engaged in any conduct which would subject him to discipline under the Disciplinary Rules if he were engaged in the practice of law and that he will not do so in the future. In the absence of such showing, the suspension will become permanent.

Costs of the proceeding are taxed to the respondent.

JUDGMENT OF SUSPENSION.