416 N.W.2d 515 (1987)
277 Neb. 1
STATE ex rel. NEBRASKA STATE BAR ASSOCIATION, Relator,
v.
Paul L. DOUGLAS, Respondent.
No. 85-535.
Supreme Court of Nebraska.
December 4, 1987.
*518 Dennis G. Carlson, Counsel for Discipline, and Thomas J. Walsh, Omaha, for relator.
William E. Morrow and Tamra L. Wilson of Erickson & Sederstrom, P.C., Omaha, for respondent.
Robert M. Spire, Atty. Gen., and A. Eugene Crump, Lincoln, for the State.
BOSLAUGH, C.J., Pro Tem., HASTINGS, SHANAHAN, and GRANT, JJ., and MORAN and HOWARD, District Judges, and COLWELL, District Judge, Retired.
PER CURIAM.
This is a disciplinary proceeding against Paul L. Douglas, respondent, who was admitted to the practice of law in Nebraska on June 18, 1953. He was elected county attorney of Lancaster County, Nebraska, in 1961, and Attorney General of Nebraska in 1975. He held the office of Attorney General until his resignation effective January 2, 1985.
Commencing in 1976 and extending through 1981, the respondent had a number of transactions with Marvin E. Copple, who was developing land for residential purposes in and near Lincoln, Nebraska. Copple was also an officer and director of Commonwealth Savings Company. The respondent's activities in these matters are the basis for the charges filed against him in this proceeding. These matters were also the basis for articles of impeachment against the respondent, adopted by the Legislature on March 14, 1984, and an indictment returned on June 14, 1984. See, State v. Douglas, 217 Neb. 199, 349 N.W. *519 2d 870 (1984); State v. Douglas, 222 Neb. 833, 388 N.W.2d 801 (1986).
Although the facts in this case are generally the same as those stated in the impeachment case, there are important differences in the question presented. In the impeachment case the evidence was presented to this court, sitting as an impeachment court, to try the articles of impeachment adopted by the Legislature against Paul Douglas, the Attorney General of Nebraska. By a divided court, respondent was found not guilty of the impeachment charges. The court held that "an impeachment proceeding is to be classed as a criminal prosecution in which the State is required to establish the essential elements of the charge beyond a reasonable doubt." State v. Douglas, supra, 217 Neb. at 201, 349 N.W.2d at 874.
In this proceeding, we are reviewing charges that respondent was guilty of misconduct as a lawyer in various described activities set out in the formal disciplinary charges against him. Although some of those charges are similar to the impeachment articles, others are not. As an example, the articles of impeachment made no reference to the Nebraska Political Accountability and Disclosure Act, Neb.Rev. Stat. §§ 49-1401 et seq. (Reissue 1978 & 1984), the violation of which is the basis for five of the counts alleged in this proceeding.
The standard of proof in this proceeding is proof by clear and convincing evidence, and the question is not whether the respondent was guilty of an impeachable offense, but whether the conduct of the respondent violated the Code of Professional Responsibility. The issues to be decided are different; the burden of proof is different; and the evidence presented is different.
Formal charges against the respondent in this matter were filed in this court on July 8, 1985, by the Disciplinary Review Board of the Nebraska State Bar Association. Additional charges were filed on July 24, 1985, and October 7, 1986, by the Counsel for Discipline of the Nebraska State Bar Association.
The respondent's answer was filed on October 8, 1985, and additional answers were filed on October 21, 1986, and November 10, 1986.
On November 4, 1985, Thomas R. Burke was appointed referee.
The complainant's reply was filed on November 12, 1986.
The hearing before the referee commenced on November 18, 1986, and continued for 6 days. Nine volumes of testimony and over 85 exhibits were offered.
The referee filed his report on January 23, 1987. Exceptions to the report of the referee were filed by the Counsel for Discipline on January 28, 1987. Written briefs were then filed, and the matter was heard in this court on April 24, 1987.
Although the formal charges consisted of 11 counts, the complainant elected to present no evidence in regard to count X. Our opinion, therefore, will discuss only the remaining counts.
The record shows, and the referee found, that in 1976 the respondent and Paul Galter, a friend of the respondent's, agreed with Marvin Copple to assist Copple in the development of a tract of land in Lincoln, Nebraska, that was to be known as Fox Hollow. Copple was a vice president and director of Commonwealth Savings Company, an industrial loan and investment company. Copple was to supply the capital, and the respondent and Galter were to do some of the work, including legal work. The respondent and Galter were to be compensated through an arrangement that involved conveying some of the lots to the respondent and Galter. When Copple found purchasers for the lots, the respondent and Galter were to convey to the purchasers and retain the difference between the price paid by the purchasers and the amount paid to Copple after the lots had been sold.
The respondent and Galter signed three purchase agreements, dated January 12, 1977; September 8, 1977; and June 1, 1979.
The January 12, 1977, agreement described 26 lots, for which the respondent and Galter agreed to pay $241,774. The *520 agreement acknowledged payment of $100 per lot and contained provisions requiring payment of the balance due, with interest.
On April 20, 1977, the respondent executed a promissory note and a mortgage in the amount of $241,774 to Commonwealth. A check from Commonwealth in the amount of $241,774, payable to the respondent, Galter, and Copple, was endorsed by the respondent and Galter and delivered to Copple.
The September 8, 1977, agreement described 40 lots, with a purchase price of $320,755. The June 1, 1979, agreement described 12 lots, with a purchase price of $105,600.
On December 27, 1977, the respondent and Galter received $371,814 through a transaction arranged by Copple. A Commonwealth check payable to J.A. Driscoll, Copple's secretary, was delivered to the respondent and Galter, who endorsed the check and deposited it in their partnership P.P.S.S.'s account. Copple conveyed 30 of the lots involved in the September 8, 1977, agreement to the respondent, who then conveyed the 30 lots to Driscoll. Copple received $320,755 of the proceeds by check from P.P.S.S.
On July 20, 1979, Driscoll paid the respondent and Galter $120,000 for the 12 lots described in the June 1, 1979, agreement. The respondent and Galter then paid Copple $105,600.
As a result of these transactions, the respondent and Galter each received approximately $44,772. The respondent also received $37,500 directly from Copple for his services to Copple in connection with Fox Hollow and another development known as Timber Ridge.
The respondent's activities in regard to the Fox Hollow and Timber Ridge developments included services in connection with an easement for sewerlines across property adjacent to Fox Hollow; obtaining an executive order for installation of utilities; and services in connection with problems regarding a flood plain easement, the construction of a powerline near Fox Hollow, and noise problems resulting from aircraft flights over Timber Ridge.
In 1981 and 1982, Paul Amen, director of the Nebraska Department of Banking and Finance, requested additional legal assistance from the respondent, as Attorney General. An assistant attorney general hired for that purpose left, after 1 week, in late September or early October 1982. At about this time, a Federal Bureau of Investigation agent, John Campbell, advised Amen concerning investigation of matters involving the First Security Bank and Trust of Beatrice, Nebraska. Agent Campbell told Amen that the Beatrice investigation might spill over into Commonwealth. Amen then told the respondent there was a serious need for additional legal assistance, and alluded to the Beatrice investigation and the possible spillover to Commonwealth.
On March 10, 1983, a copy of a letter to Amen from Agent Campbell's supervisor was sent to the respondent. The letter specifically mentioned a more than $750,000 loan transaction in which the proceeds of the loan went to S.E. Copple, Marvin's father and president of Commonwealth, and none to the "borrower." The March 10 letter was discussed at a meeting in the respondent's office on March 14, 1983. At that time Amen was attempting to prevent Commonwealth from becoming insolvent.
In early May 1983, Barry Lake, counsel for the Department of Banking, told the respondent that he had information about a transaction in which Marvin Copple had received $500,000 from Commonwealth, a part of which might constitute theft.
At about this time, respondent assigned Ruth Anne Galter, an assistant attorney general, to the banking department. In June 1983, she mentioned the $500,000 transaction involving Marvin Copple to the respondent.
On November 1, 1983, Amen declared Commonwealth insolvent. On November 18, 1983, the respondent appointed David A. Domina as a special assistant attorney general to handle matters involving Commonwealth. It was at this time that the respondent determined he was disqualified *521 from handling matters relating to Commonwealth.
On November 30, 1983, Domina examined the respondent under oath concerning his transactions with Copple. When asked what arrangement the respondent had with Copple for compensation for his services with respect to Fox Hollow, the respondent described the lot sale arrangement only. In fact, the respondent had received $37,500 from Copple, most of which was for his services in regard to Fox Hollow.
In a letter to Richard G. Kopf, special counsel for the Special Commonwealth Committee of the Legislature, dated February 6, 1984, the respondent admitted that he had received a total of $77,272.11 for his services for more than 1,500 hours of work over a period of 5 years.
At a hearing before the Special Commonwealth Committee on February 24 or 25, 1984, the respondent admitted that he knew the purpose of Domina's questions on November 30, 1983, and that he should have supplied Domina with the information concerning the money he had received from Copple.
Additional facts will be discussed in the analysis relating to particular counts.
A proceeding to discipline an attorney is a trial de novo on the record, in which the Supreme Court reaches a conclusion independent of the findings of the referee, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. See, State ex rel. Nebraska State Bar Association v. Walsh, 206 Neb. 737, 294 N.W.2d 873 (1980); State ex rel. Nebraska State Bar Assn. v. Jensen, 171 Neb. 1, 105 N.W.2d 459 (1960). Cf. Hughes v. Enterprise Irrigation Dist., 226 Neb. 230, 410 N.W.2d 494 (1987).
In its de novo review of the record in a disciplinary proceeding against an attorney, and to sustain a particular complaint against an attorney, the Supreme Court must find that the complaint has been established by clear and convincing evidence. State ex rel. NSBA v. Roubicek, 225 Neb. 509, 406 N.W.2d 644 (1987); State ex rel. NSBA v. Kelly, 221 Neb. 8, 374 N.W.2d 833 (1985); State ex rel. Nebraska State Bar Assn. v. Michaelis, 210 Neb. 545, 316 N.W.2d 46 (1982). We have referred to this standard of proof as "`a clear preponderance of the evidence....'" See State ex rel. NSBA v. Kelly, supra 221 Neb. at 12, 374 N.W.2d at 836.
In a disciplinary proceeding against an attorney, the basic issues are whether discipline should be imposed and, if so, the type of discipline appropriate under the circumstances. State ex rel. NSBA v. Roubicek, supra; State ex rel. NSBA v. Kelly, supra.
The Code of Professional Responsibility (Code) originally adopted by this court in 1970, as amended, consists of nine basic canons, supplemented by ethical considerations (EC) and disciplinary rules (DR). All of the counts allege a violation of one or more of the following subsections of Canon 1, DR 1-102, of the Code:
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
....
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
All of the counts also allege a violation of the respondent's oath as an attorney, as set out in Neb.Rev.Stat. § 7-104 (Reissue 1983).

COUNT I
In its "formal charge" against respondent, the Committee on Inquiry of the Second Disciplinary District alleged:

*522 COUNT I
1. From the year 1977 to and including 1980, Paul L. Douglas, the Respondent, purchased real estate from the said Marvin E. Copple and provided to him consulting and legal services regarding various land developments undertaken by the said Marvin E. Copple.
2. That in the sworn statements of November 30, 1983, and December 12, 1983, hereinabove referred to, which were given and made by the said Paul L. Douglas, Respondent, he was asked numerous questions by the said David A. Domina, Special Assistant Attorney General of the State of Nebraska, concerning compensation and legal fees received by Paul L. Douglas, Respondent, from the said Marvin E. Copple; that in said sworn statements, Paul L. Douglas, Respondent, knowingly and intentionally failed to disclose to said David A. Domina, Special Assistant Attorney General of the State of Nebraska, that he, the Respondent, had actually received compensation and legal fees from the said Marvin E. Copple during the years 1977 to and including 1980, in the aggregate amount of $37,500.00.
3. That the above alleged acts of the Respondent, as set forth in this Count I, constitute a violation of the oath of office of an attorney taken by the said Respondent at the time he was admitted to practice law in the State of Nebraska, as set forth in Section 7-104, Revised Statutes of Nebraska, 1943, and all of which were and are a violation of the following provisions of the Code of Professional Responsibility adopted by the Supreme Court of the State of Nebraska on May 1, 1970, and as subsequently amended, to wit:
DR 1-102 Misconduct.
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
Sometime before his election as Attorney General, respondent and Paul Galter, an attorney and friend of respondent's, had borrowed from four banks to cover a $40,000 loss sustained in their joint venture for trading in the commodities market. The bank loans were still unpaid in 1976, after respondent became Attorney General. As related by Galter:
I had also had a business venture with Paul [respondent] in the commodity market that had been ongoing for several years which had resulted in losses to both of us, and I thought thatand I know that Paul was looking for some type of outside activity to supplement his own regular income as the Attorney General so that he could repay that loss.
In April 1976, Marvin Copple had purchased undeveloped farmland, later known as Fox Hollow, and had used the services of Galter in acquisition of that farmland. Copple anticipated 230 lots in the proposed residential development of the farmland and 697 lots in a contemplated total development which would include other land. According to Copple, Galter, as Copple's attorney, suggested that "we include General Paul Douglas in on it and that he wouldthat Paul Douglas would be a good team member to help with the problems that would be coming up." Copple met with Galter and respondent, and, after discussing the prospective real estate development, later reached a "mutual agreement that [Galter and respondent] would be compensated for the work that they did," when lots sold by Copple at a "discount" to Galter and respondent would be resold at a higher price with the "profit" split between Galter and respondent. While Galter did legal research regarding the development, respondent's "role was primarily to counsel with [Copple and Galter]; come up with the ideas and work on whatever matters needed to be developed." According to respondent, at an unspecified time during such relationship, respondent and Copple agreed that respondent "ought to be compensated for workas work was completed at aat *523 a price that [we] agreed that I [respondent] should be compensated." Thereafter, as different projects were completed, Copple paid respondent for work done regarding the real estate developments.
Respondent's work for Copple related to three Fox Hollows (Fox Hollow Addition, Fox Hollow First, and Fox Hollow Second) and another Copple development, Timber Ridge. Although respondent never submitted a bill or statement for services rendered, he told Copple the things he was doing or had done involving Copple's developments, and Copple would then issue a check to pay respondent.
In 1978, Copple paid respondent $5,000 for work pertaining to storm sewers in Fox Hollow. In his federal income tax return for 1978, respondent reported total taxable income of $40,687, including his salary of $32,500 as Attorney General and $5,000 as a "management fee" from an unidentified source. During 1979, respondent assisted Copple by monitoring eminent domain proceedings by the city of Lincoln to acquire a municipal easement which benefited Fox Hollow in the form of sewer and utility service for the development. For services regarding the easement, Copple paid respondent $5,000 on April 12, 1979. Later in 1979, respondent did additional work for Copple which pertained to Timber Ridge and a noise problem caused by military aircraft flying over the development. Respondent communicated with the commander of Offutt Air Force Base and received information about military use of the Lincoln airport near Timber Ridge. On September 5, 1979, Copple paid respondent $7,500 for work on Timber Ridge. Respondent's federal tax return for 1979 showed total taxable income of $64,562, including his salary as Attorney General in the amount of $39,500 and a management fee (source unidentified) of $12,500. In 1980, respondent represented Copple concerning a flood plain easement regarding Fox Hollow. That representation involved contacts with lawyers for the U.S. Corps of Engineers and with the U.S. attorney for Nebraska. As reimbursement for expenses incurred regarding the Timber Ridge development, Copple paid respondent $2,500 on April 25, 1980. On August 29, 1980, Copple issued a check for $5,000 payable to respondent for work relative to the Corps of Engineers and the flood plain pertaining to Fox Hollow. By an additional check, Copple paid respondent $15,000 on December 23, 1980, for the flood plain matter. In his federal income tax return for 1980, respondent reported total taxable income of $51,681, including his Attorney General's salary of $39,500 and $15,000 as a management fee from an unidentified source. Therefore, for respondent's services rendered on Copple's two real estate developments, Fox Hollow and Timber Ridge, during the period from 1978 to 1980, Copple, by five checks, paid respondent the aggregate sum of $37,500, of which $30,000 related to work on Fox Hollow and $7,500 to work on Timber Ridge.
After Commonwealth Savings Company was declared insolvent in November of 1983, David A. Domina was appointed by respondent as a special assistant attorney general for the State of Nebraska to investigate the circumstances surrounding the financial collapse of Commonwealth. In a transcribed interview conducted on November 30, 1983, at the offices of the Attorney General in the State Capitol, respondent acknowledged that he was Nebraska's Attorney General, and, after the Miranda warning was stated to respondent, see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the following questions were asked by Domina, with answers given by respondent:
Q. Did you serve as counsel in connection with [Timber Ridge] development and receive compensation?
A. Yes.
Q. Were there other developments in addition to the Fox Hollow and Timber Ridge in which you served as counsel for Marv Copple or any of the Copple family?
A. First of all, I did no other business with anybody else in the Copple family except Marv.
Q. All right. Were there other developments, then, besides Fox Hollow and *524 Timber Ridge for which you were paid for services as counsel?
A. There was always something coming up, and as it was requiring my time and my counseland I would remind him of it and periodicallyhe would pay me for it....
....
Q. Did you ever specifically bill Mr. Copple for your counsel on these other projects other than Fox Hollow and Timber Ridge?
A. No.
Q. Did you ever give him orally, you know, a figure or ask for a specific amount of compensation on those other projects?
A. No.
Q. How did he pay you for your services on the projects other than Fox Hollow and Timber Ridge or did he?
A. He never did pay me.
Q. With respect to Fox Hollow, then, what was the arrangement that you had with Mr. Copple for compensation for your services as counsel, then?
To the last question asked by Domina, respondent again stated the plan whereby he and Galter acquired lots from Copple at a reduced price, or "discount," and expected to resell those lots at a price greater than the purchase price, thereby making a profit which would "compensate us for the work that we had done helping Marvin develop those lots."
Domina then continued the questioning:
Q. Okay. I want to be sure that I understand the terms of the compensation on that arrangement and then I can go on to something else here....
....
A. ... [Marvin Copple] was more than willing to share that profit and to compensate people forfor the money that he was making with the people that helped him put it together....
....
... I was confident that he would compensate us well because he was going to have toif he didn't compensate us well for it, it was all going to go to taxes anyway. But I think it was a way, and I didn'tyou know, if he did it by the lot or if he just paid us in cash, he would have had the same tax problem. I don't think hehe saw that solve any of his tax problems by doing it with contracts.
In the course of the November 30 interview, respondent mentioned his dissatisfaction expressed to Marvin Copple concerning compensation derived from resale of the lots. Respondent then stated that Copple had told him not to worry about the situation, because the profit on resale of the lots would "well compensate us for the services that we had rendered" regarding the Copple real estate developments.
A second interview of respondent was conducted by Domina at the Capitol on December 12, 1983. Domina renewed his inquiry into respondent's involvement in Copple's real estate developments and compensation for services rendered to Copple. When Domina asked a question concerning respondent's interest in Timber Ridge, the following transpired:
Q. You were going to get a fractional interest in the whole tract?
A. That's correct.
Q. What was the fraction?
A. Ten percent
Q. For you and ten percent for Galter?
A. Correct.
Q. Was that his compensation for your work and its development?
A. And there was a lot more work to be done to develop it, yes.
Q. But it was compensation?
A. Yes.
Q. So, in that connection the arrangements were the same as the Fox Hollow
A. No, no. No, there wasn't going to be anything the way Fox Hollow was done.
With Fox Hollow what we did was we bought lots at a lower price and then made whatever amount of profit we were going to make from the sale of the lots.

*525 Q. I thought I understood you to say in your first statement that you were allowed to get into the Fox Hollow deal as compensation for consultation services?
A. Yes. But I mean I didn't give a percentage. I didn't get a percentage.
Q. But you were allowed to buy lots without investing any money?
A. Right. But on this one we were going to get a percentage.
Q. Okay. Instead of specific lots....
A. Yes.
Q. You were to get an undivided 10th interest in exchange for your services?
A. Yes.
Q. But at Fox Hollow you had specific lots?
A. That I had to buy.
On February 6, 1984, respondent wrote a letter to Richard G. Kopf, special counsel for the Special Commonwealth Committee of the Nebraska Legislature. In that letter, which respondent signed as Attorney General, he reiterated the compensation arrangement with Copple, that is, Copple "was willing to compensate us for our services by allowing us to participate in the profits of future lot sales." In his letter to Kopf, respondent also wrote:
I received compensation in the form of reduced price purchases of Fox Hollow lots, money, and a, to date unconveyed, 10% interest in Timber Ridge. The interest in Timber Ridge will not now be conveyed and is of questionable value in any event. That compensation was paid to me in accordance with the general agreement and understanding between Paul Galter, myself and Marvin Copple. As the course of dealings proceeded, the oral agreement and the method of compensation was changed.
Later, in his letter of February 6 to Kopf, respondent stated:
Although I advised Mr. Domina that Marvin Copple made payments to me from time to time, no one has ever asked me whether or not the only payments I received for my services in connection with all the real estate developments in which Paul Galter, Marvin Copple and I were involved were received as profits from the lot sales. Because of the extensive additional work which I did and in which Paul Galter had little participation relating to the noise problems, alternative construction methods, the flowage easement and miscellaneous other matters, I was paid a total of $32,500 during 1978, 1979 and 1980. For more than 1,500 hours of work over a period of five years, I received a total of $77,272.11.
At a hearing before the Special Commonwealth Committee on February 24, 1984, respondent referred to the Domina interviews and told the committee:
I wish I would have told them about the extra 32 five. I didn't, but that hardly puts me in the role that he says that I belong in, but interestingly enough, on his examination of me, he asked me this question: "All right. Were there other developments, then, besides Fox Hollow and Timber Ridge for which you were paid for services as counsel"? That was the question. "Were there other developments besides Fox Hollow and Timber Ridge for which you were paid for services as counsel", and I responded, "There was always something coming up, and it required my time and counsel. I would remind him of it periodically; he would pay me for it". Now, he didn't pursue that. It is quite obvious that I didn't volunteer it, and I should have.
On the nextLater on on that page, he asks the question slightly different, and I played the part of the lawyer and answered his question. Again, I say, I should have told him. "Did you especially bill Mr. Copple for your counsel on these other projects other than Fox Hollow and Timber Ridge"? And the answer was, "No", and that is a correct answer, but I knew what he wanted. "Did you ever give him orally, you know, a figure or ask for a specific amount for compensation on these other projects"? The answer was "No". "How did he pay you for your services on the project other than Fox Hollow? How did he pay you for your services on the projects other than Fox Hollow and Timber *526 Ridge, or did he"? I answered the first part of the question by saying, "He never did pay me", meaning he never did pay me for projects other than Fox Hollow and Timber Ridge, and I realize that when I got my statement, and one of the first things we talked about, and one of the things that I did in the two-week period of time was to put it in the report, not only put it in that I had gotten paid, but tell you the exact amount of money that I made.
In the course of the legislative hearing, and in response to interrogation by special counsel Kopf concerning nondisclosure of fees paid by Copple, respondent remarked:
Every time this investigation moves along, it seems like there is always another little matter that seems to be the great big focal point. All of a sudden, it seems like the whole purpose of this 16-man committee16-person committee excuse meis why I didn't disclose the 32 five....
In further questioning by Kopf concerning the Domina interview of November 30, 1983, and respondent's failure to mention the "fees" paid by Copple, respondent responded: "You are saying to me, why didn't you volunteer more than the answer to the question, and I have told you, I'm sorry. I wish I would have, and I should have. I admit that."
In June 1984, a newspaper article listed the checks from Marvin Copple to Douglas. The total of those checks was $37,500, not $32,500 as previously mentioned by respondent in his letter to Kopf and in his statements before the special legislative committee. By reviewing his bank statements, respondent verified the payments by Copple, filed an amended income tax return for 1980, and stated that he honestly believed his total "additional compensation was thirty-two five, where in fact it was thirty-seven five." In his amended tax return for 1980, respondent also explained the previously omitted payment from Copple: "During the taxable year 1980, the taxpayer received a check for $5,000.00 from Marvin Copple. It has subsequently been determined that this amount is earned income."
Respondent resigned as Attorney General on January 2, 1985.
In proceedings before the referee appointed for the disciplinary process now under examination, respondent was questioned about the Domina interview of November 30, 1983:
Q .... And was it in a statement that Mr. Domina asked you about your compensation, and you didn't him tell [sic] aboutabout the thirty-seven five?
A. That's not true at all.
Q. Did you tell him about the thirty-seven five?
A. I did not.
Q. Did you later testify that you knew what he wanted, but you decided to play lawyer, and you just didn't tell him about it?
A. That's true.
At the hearing before the referee, respondent also acknowledged that he had been paid $5,000 in 1978, $12,500 in 1979, and $20,000 in 1980, or payments in the total of $37,500, as compensation for services rendered concerning the Copple real estate developments, and that moneys retained from the "lot transactions" as well as the $37,500 paid by Copple were "compensation for services rendered" for Marvin Copple.
In his report, the referee made the following findings:
7. Marvin Copple, Paul Galter, and the Respondent agreed orally that Galter and the Respondent would be compensated for their services with respect to the Fox Hollow development by means of an arrangement by which Copple would convey certain lots in the development to Galter and the Respondent at specified prices, and, once Copple had found third-party purchasers for the lots, Galter and the Respondent would convey the lots to the third parties, pay to Copple the original purchase price, and retain the balance as compensation for services to Copple....
....

*527 14. In addition to profits from lot sales, the Respondent asked Marvin Copple to pay him directly for services related to Copple's real estate developments. Copple write [sic] six checks to the Respondent in the following amounts:

December 19, 1978 $ 5,000.00
April 12, 1979 5,000.00
September 5, 1979 7,500.00
April 25, 1980 2,500.00
August 29, 1980 5,000.00
December 27, 1980 15,000.00

The total of the six checks was $40,000. The April 25, 1980 check for $2,500 apparently was for the purpose of reimbursement for expenses related to the Timber Ridge development.... The Respondent retained the proceeds from the other five checks, in a total amount of $37,500, for compensation for his services on various aspects of the Fox Hollow and Timber Ridge developments.
....
25. On November 30, 1983, David Domina asked if there were developments "besides Fox Hollow and Timber Ridge for which you were paid for services as counsel?" The Respondent answered, "There was always something coming up, and as it was requiring my time and my counseland I would remind him of it and periodicallyhe would pay me for it." ... Domina then asked, "Did you ever specifically bill Mr. Copple for your counsel on these other projects other than Fox Hollow and Timber Ridge?"... Answer: "No." Question: "Did you ever give him orally, you know, a figure or ask for a specific amount of compensation on those other projects?" Answer: "No." Question: "How did he pay you for your services on the projects other than Fox Hollow and Timber Ridge or did he?" Answer: "He never did pay me." ... Question: "With respect to Fox Hollow, then, what was the arrangement that you had with Mr. Copple for compensation for your services as counsel, then?" ... The Respondent answered by describing the lot purchase agreements and the manner in which he and Paul Galter were paid by the sale of lots. The Respondent was not asked specifically and did not tell Domina in response to this series of questions ... that he received compensation for work on Fox Hollow and Timber Ridge by means of checks written to him by Marvin Copple. The only question by Domina to which discussion of the Copple checks would have been a responsive answer was the question ["With respect to Fox Hollow, then, what was the arrangement that you had with Mr. Copple for compensation for your services as counsel, then?"].
26. On December 12, David Domina asked the Respondent what his interest in Timber Ridge was. The Respondent replied that Marvin Copple had agreed that when the property was platted, the Respondent and Paul Galter each would receive a 10 percent ownership interest as compensation for their work on its development.... Domina did not ask whether the Respondent actually received the 10 percent interest or if he received any other form of compensation for work on Timber Ridge. Instead, Domina asked whether the Timber Ridge compensation plan was the same as for Fox Hollow, to which the Respondent replied that it was not. The Respondent was not asked for, nor did he volunteer, the information that instead of an ownership interest in Timber Ridge, he received direct payments by check from Marvin Copple.
....
29. There is no direct evidence that the Respondent intended to conceal from David Domina the fact that the Respondent had received direct payments from Marvin Copple for his work on Copple's real estate developments. Although the Respondent bypassed opportunities during the November 30 and December 12, 1983 questioning to reveal details of the direct payments from Copplehe did state that Copple paid him ...and although his answer to the question concerning compensation for Fox Hollow work ... discussed only the lot transactions and did not include the direct payments by check, I conclude that the Respondent did not intentionally withhold *528 that information from Domina. The Respondent reasonably could have perceived that the November 30 and December 12, 1983 statements were being taken in an adversarial context and that his responses could be used against him.... It is apparent from the Respondent's willingness to answer other questions put to him by Domina that he would have disclosed his receipt of direct payments from Copple had Domina followed up the several opportunities he had to ask more specific questions about compensation other than the lot arrangements.
In his report, the referee concluded:
Count I: Nondisclosure of Direct Payments
The Relator, in Count I, charges that the Respondent violated DR 1-102 when he failed to disclose, during his two sworn statements to David Domina, that he had received a total of $37,500 from Marvin Copple in compensation and legal fees from 1977 to 1980.
The transcripts of the statements to Domina show, and the Respondent admits, that the Respondent did not at that time tell Domina that he had received direct payments by check for his work for Copple in addition to the compensation paid by means of the discounted purchase and resale of 78 lots in the Fox Hollow development. However, Domina asked only one question during two questioning sessions that actually called for disclosure of direct compensation for work on the Fox Hollow or Timber Ridge developments. All other questions going to compensation were specifically addressed to projects other than Fox Hollow and Timber Ridge or were restricted in scope to the plan for compensation by purchase and resale of Fox Hollow lots. Each of these other questions were [sic] answered within the scope of the questions, but not beyond. The one question Domina asked that was broad enough to encompass direct payments: "With respect to Fox Hollow, then, what was the arrangement for your services as counsel, then?"....
....
The difficulty on this count is determining whether the Respondent should be held to the duties of his public role at the time of the questioning by Domina or should be afforded the latitude allowed one whose conduct is under investigation and who may be subject to prosecution. If his duties to aid the investigation were paramount at the time of his statements to Domina, the Respondent should have disclosed what he knew Domina wished to know, even if not specifically asked for the information. But if his public role did not control the situation, the Respondent properly could have "played the lawyer" and answered only the questions actually asked.
... [T]he proper characterization of the Respondent's role in answering potentially inculpatory questions was that of a suspect being interviewed by a prosecutor rather than that of the chief prosecutor assisting an investigation by another servant of the public interest. In that context, the Respondent cannot appropriately be held to the fiduciary duties he owed the public with respect to matters on which he actively represented the State's interests, and it was legally and ethically permissible for him to answer questions truthfully and completely, within the restraints of the give-and-take of live questioning, without volunteering information not requested.
....
... I am unable to find by a clear preponderance of the evidence that the Respondent acted deceptively when he failed to disclose to David Domina in late 1983 the amount of money paid to him directly by Marvin Copple.
In reaching his conclusion that respondent was not obligated to disclose the nature of all compensation derived from Copple, the referee makes veiled reference to a suspect's privilege against self-incrimination during custodial interrogation, see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the proscription against postarrest silence, pursuant to the Miranda warning, used as evidence. See Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), wherein *529 the U.S. Supreme Court held that "use for impeachment purposes of [an arrestee's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. at 2245.
Therefore, we must dispel any misconception that nondisclosure by respondent was justified pursuant to Miranda v. Arizona, supra, where the U.S. Supreme Court reviewed various aspects of a suspect's custodial interrogation by police or law enforcement personnel, namely, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. See, also, Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The warning specified in Miranda v. Arizona, supra, is required only when a law enforcement officer has restricted the freedom of the person interrogated, thereby rendering such person in "custody." See State v. Brown, 225 Neb. 418, 405 N.W.2d 600 (1987). If the person to be questioned is not in custody, the Miranda warning is not required before interrogation. See State v. Bodtke, 219 Neb. 504, 363 N.W.2d 917 (1985). Nothing in the record indicates that respondent, who was being interviewed in his office at the State Capitol, was in any manner deprived of his freedom in any significant way, before or during the interrogation by Special Assistant Attorney General Domina. We do, therefore, disagree with the referee's view of respondent as a "suspect being interviewed by a prosecutor rather than that of the chief prosecutor assisting an investigation by another servant of the public interest," that is, characterization of respondent as a suspect subjected to custodial interrogation by law enforcement personnel, thereby triggering the safeguards in the Miranda warning, including the privilege of silence as a means to avoid a suspect's inculpatory statement. Because custodial interrogation is absent in the present case, we need not consider whether silence, existing by virtue of the Miranda warning, may be used as evidence in civil proceedings such as respondent's case now before this court.
We now address the question whether respondent had the duty to disclose information concerning all compensation, including payment of fees, which he received from Copple. When he received such payments from Copple, and was later interviewed by Domina, respondent was the elected Attorney General of the State of Nebraska. Count I of the complaint against respondent does not restrict the charge to an affirmative misrepresentation, such as a statement consisting of an actual misrepresentation of fact. The charge in count I embodies, in part, an allegation that respondent engaged in conduct which involved "dishonesty, fraud, deceit, or misrepresentation."
"Although the general rule is that `one party to a transaction has no duty to disclose material facts to the other,' and [sic] exception to this rule is made when the parties are in a fiduciary relationship with each other." Midland Nat. Bank, etc. v. Perranoski, 299 N.W.2d 404, 413 (Minn.1980). See, also, Callahan v. Callahan, 127 A.D.2d 198, 514 N.Y.S.2d 819 (1987). When a relationship of trust and confidence exists, the fiduciary has the duty to disclose to the beneficiary of that trust all material facts, and failure to do so constitutes fraud. See 37 C.J.S. Fraud § 16d (1943).
Regarding the law of trusts and disclosure by a fiduciary, we have said:
"It is the duty of a trustee to fully inform the cestui que trust [beneficiary] of all facts relating to the subject matter of the trust which come to the knowledge of the trustee and which are material to the cestui que trust to know for the protection of his interests."
(Emphasis supplied.) Johnson v. Richards, 155 Neb. 552, 566-67, 52 N.W.2d 737, 746 (1952). See, also, St. Paul Fire & Marine Ins. Co. v. Truesdell Distributing Corp., 207 Neb. 153, 296 N.W.2d 479 (1980).
Throughout the United States, public officers have been characterized as *530 fiduciaries and trustees, charged with honesty and fidelity in administration of their office and execution of their duties. See, Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 86 A.2d 201 (1952); Marshall Impeachment Case, 363 Pa. 326, 69 A.2d 619 (1949); Fuchs v. Bidwill, 31 Ill.App.3d 567, 334 N.E.2d 117 (1975); Jersey City v. Hague, 18 N.J. 584, 115 A.2d 8 (1955); Matter of Parsons v. Steingut, 185 Misc. 323, 57 N.Y.S.2d 663 (1945). See, also, People v. Savaiano, 66 Ill.2d 7, 15, 3 Ill. Dec. 836, 841, 359 N.E.2d 475, 480 (1976) (member of county board; public officials "owe a fiduciary duty to the people they represent"); Williams v. State, 83 Ariz. 34, 36-37, 315 P.2d 981, 983 (1957) (state land commissioner; "The relationship between a state official and the state is that of principal and agent and trustee and cestui que trust"); In re Removal of Mesenbrink as Sheriff, 211 Minn. 114, 117, 300 N.W. 398, 400 (1941) (sheriff; "A public office is a public trust. Such offices are created for the benefit of the public, not for the benefit of the incumbent").
"An affirmative statement is not always required, however, and fraud may consist of the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak." Tan v. Boyke, 156 Ill.App.3d 49, 54, 108 Ill.Dec. 229, 232, 508 N.E.2d 390, 393 (1987). See, also, Krueger v. St. Joseph's Hospital, 305 N.W.2d 18 (N.D.1981) (fraud may arise not only from misrepresentation but from concealment as well, where there is suppression of facts which one party has a legal or equitable obligation to communicate to another). "Concealment" means nondisclosure when a party has a duty to disclose. See Reed v. King, 145 Cal.App.3d 261, 193 Cal.Rptr. 130 (1983). "Conceal means to hide, secrete, or withhold from knowledge of others...." State v. Copple, 224 Neb. 672, 691, 401 N.W.2d 141, 155 (1987). See, also, Nelson v. Cheney, 224 Neb. 756, 401 N.W.2d 472 (1987); Christopher v. Evans, 219 Neb. 51, 361 N.W.2d 193 (1985). "The word conceal pertains to affirmative action likely to prevent or intended to prevent knowledge of a fact...." State v. Copple, supra.
It is a general principle in the law of fraud that where there is a duty to speak, the disclosure must be full and complete. It is firmly established that a partial and fragmentary disclosure, accompanied with the wilful concealment of material and qualifying facts, is not a true statement, and is as much a fraud as an actual misrepresentation, which, in effect, it is. Telling half a truth has been declared to be equivalent to concealing the other half. Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated. If he speaks at all, he must make a full and fair disclosure. Therefore, if one wilfully conceals and suppresses such facts and thereby leads the other party to believe that the matters to which the statements made relate are different from what they actually are, he is guilty of a fraudulent concealment.
37 Am.Jur.2d Fraud and Deceit § 151 at 208-09 (1968).
Moreover, where one has a duty to speak, but deliberately remains silent, his silence is equivalent to a false representation. See, Security St. Bk. of Howard Lake v. Dieltz, 408 N.W.2d 186 (Minn.App. 1987); Callahan v. Callahan, 127 A.D.2d 298, 514 N.Y.S.2d 819 (1987); Holcomb v. Zinke, 365 N.W.2d 507 (N.D.1985); Anderson v. Anderson, 620 S.W.2d 815 (Tex.Civ.App.1981); 37 C.J.S. Fraud § 16a (1943).
In passing upon the propriety of action by a commission council, the Supreme Court of Louisiana, in Plaquemines Par. Com'n Council v. Delta Dev., 502 So.2d 1034, 1039-40 (La.1987), stated: "Public officials occupy positions of public trust.... The duty imposed on a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts *531 which materially affect his rights and interests."
As expressed in U.S. v. Holzer, 816 F.2d 304, 307 (7th Cir.1987): "A public official is a fiduciary toward the public ... and if he deliberately conceals material information from them he is guilty of fraud."
"To reveal some information on a subject triggers the duty to reveal all known material facts." Hendren v. Allstate Ins. Co., 100 N.M. 506, 511, 672 P.2d 1137, 1142 (1983). See, also, Ingaharro v. Blanchette, 122 N.H. 54, 440 A.2d 445 (1982); Wirth v. Commercial Resources, Inc., 96 N.M. 340, 630 P.2d 292 (1981); Shaver v. Monroe Construction Co., 63 N.C.App. 605, 306 S.E.2d 519 (1983).
As expressed in 37 Am.Jur.2d, supra, § 150 at 207-08:
A party of whom inquiry is made concerning the facts involved in a transaction must not, according to well-settled principles, conceal or fail to disclose any pertinent or material information in replying thereto, or he will be chargeable with fraud. The reason for the rule is simple and precise. Where one responds to an inquiry, it is his duty to impart correct information. Thus, one who responds to an inquiry is guilty of fraud if he denies all knowledge of a fact which he knows to exist; if he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though they are literally true as far as they go; or if he fails to disclose the whole truth.
When the Domina interviews of respondent are taken in conjunction with respondent's letter to Kopf (special legislative counsel) and with respondent's statements made during the hearing before the special legislative committee, there is no doubt that respondent fully realized that Domina was seeking information about all respondent's compensation from Copple in connection with the Fox Hollow and Timber Ridge developments. Although respondent mentioned only anticipated profits on resale of lots in Fox Hollow and the unconveyed fractional interest in Timber Ridge as his compensation for services rendered to Copple, respondent later acknowledged he was "paid a total of $32,500 [actually $37,500] during 1978, 1979, and 1980." In reference to the Domina interviews, respondent expressed: "I wish I would have told them about the extra 32 five.... I knew what [Domina] wanted." What Domina was seeking during the respondent's interviews was factual information about all the compensation which respondent had received from Copple for services rendered by respondent, which necessarily included not only compensation in the form of respondent's interests in the two real estate developments but, also, fees paid by Copple. Yet respondent "played the part of the lawyer" and responded to Domina's questions with answers which created the desired and false impression that, in exchange for legal services rendered for Copple, respondent's only compensation was an unconveyed 10-percent interest in one development (Timber Ridge) and prospective resale of the underpriced lots which respondent had acquired in another development (Fox Hollow). In that manner, respondent withheld disclosure of the fees paid directly by Copple and, thus, concealed facts concerning compensation which he had received from Copple. By such half-truths resulting from partial disclosures, respondent's deliberate distortion of the truth was a deceitful suppression of facts known to respondent, and constituted fraud by concealment. As Attorney General of the State of Nebraska, respondent was required to carry out that public office with honesty and fidelity, which included the duty to make full and truthful disclosures regarding his conduct while in such position of public trust. Moreover, as an elected official charged with a public trust, respondent had neither the luxury nor the liberty of selective nondisclosure, when questioned about his conduct and activity occurring while he held the office of Attorney General.
We find that respondent, as Attorney General of the State of Nebraska, was a public official, who was obligated, as part of his duties, to make full and truthful disclosure of all information sought in the *532 course of the interviews concerning his compensation received from Copple. We further find, by clear and convincing evidence, that respondent, by nondisclosure of information and as the result of equivocal, evasive, or misleading answers given during the interviews by Domina, did fraudulently conceal the fact that respondent had been paid $37,500 by Copple as compensation for respondent's services regarding Copple's real estate developments. Therefore, contrary to the finding and disposition made by the referee, we conclude that Count I, namely, that respondent did "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation" in violation of DR 1-102(A)(4), has been established. Under the circumstances it is unnecessary that we further determine whether respondent is guilty of professional misconduct involving moral turpitude, in violation of DR 1-102(A)(3), or is guilty of any other conduct that adversely reflects on his fitness to practice law, as prohibited under DR 1-102(A)(6).

COUNTS II, III, IV, V, AND VI
These counts, in the aggregate, are concerned with certain of respondent's business activities, both as a lawyer and in the business field, between approximately January 1977 and December 1980. Each count charges that respondent committed acts which violated his oath of office as an attorney, set out in § 7-104, and were in violation of DR 1-102, previously set out in detail.
The acts set out in counts II, III, IV, and V were done in connection with various business transactions between Marvin Copple, as seller, and respondent and Paul Galter, as buyers. In this connection the formal charges allege, in pertinent part, as follows:
COUNT II
1. That on or about January 12, 1977, the Respondent, Paul L. Douglas, and Paul Galter, an attorney at law ... and a business associate of the Respondent, jointly signed a Purchase Agreement in which they contracted to purchase certain real estate from the said Marvin E. Copple for the sume [sic] of $241,744.00.
2. That at all times mentioned herein, there was in existence, the Nebraska Political Accountability and Disclosure Act, being Sections 49-1401 to 49-14, 138, Revised Statutes of Nebraska, 1943, Reissue of 1978, as amended effective August 30, 1981, 1982 Cummulative [sic] Supplement; that pursuant to the terms, provisions and requirements of said Nebraska Political Accountability and Disclosure Act, the said Paul L. Douglas, Respondent, did file on February 27, 1978, with the Nebraska Accountability and Disclosure Commission, a statement of financial interest as required by said Act for the calendar year 1977.
3. That Section 49-1496 of said Act required the Respondent to disclose the name, address and nature of business of each creditor ... to whom the Respondent may have owed or guaranteed the sum of $1,000.00 or more.
4. That in said statement filed by the said Paul L. Douglas, Respondent, on February 27, 1978, he failed to report or to disclose that he had contracted to purchase certain real estate from Marvin E. Copple for the sum of $241,744.00, and that he was so indebted to Marvin E. Copple, and that Marvin E. Copple was a creditor of the said Paul L. Douglas, Respondent, in the amount of $241,744.00; that the failure of the said Paul L. Douglas, Respondent, to so report and disclose the said indebtedness [sic].
5. That the actions of the Respondent, as set forth above, constitute a violation of his Oath of Office as an attorney licensed to practice law in the State of Nebraska, as provided by Section 7-104 R.R.S. 1977, and are in violation of the following provisions of the Code of Professional Responsibility, to-wit: [DR 1-102, as set out above].
COUNT III
1. That on or about September 8, 1977, the Respondent, Paul L. Douglas, and Paul Galter ... jointly signed a Purchase Agreement in which they contracted to purchase certain real estate from the said Marvin E. Copple for the sum of $320,755.00.

*533 2. Paragraph 2 of Count II is made a part hereof by reference, as if fully set out herein.
3. Paragraph 3 of Count II is made a part hereof by reference, as if fully set out herein.
4. That in said statement filed by the said Paul L. Douglas, Respondent, on February 27, 1978, he failed to report or to disclose that he had contracted to purchase certain real estate from Marvin E. Copple for the sum of $320,755.00, and that he was so indebted to Marvin E. Copple, and that Marvin E. Copple was a creditor of the said Paul L. Douglas, Respondent, in the amount of $320,755.00; that the failure of the said Paul L. Douglas, Respondent, to so report and disclose the said indebtedness [sic].
5. [Same as paragraph 5 in count II.]
COUNT IV
1. That on or about June 1, 1979, the Respondent, Paul L. Douglas, and Paul Galter ... jointly signed a Purchase Agreement in which they contracted to purchase certain real estate from the said Marvin E. Copple for the sum of $105,600.00.
2. Paragraph 2 of Count II is made a part hereof by reference, as if fully set out herein.
3. Paragraph 3 of Count II is made a part hereof by reference, as if fully set out herein.
4. That in said statement filed by the said Paul L. Douglas, Respondent, on March 27, 1980, he failed to report or to disclose that he had contracted to purchase certain real estate from Marvin E. Copple for the sum of $105,600.00, and that he was so indebted to Marvin E. Copple, and that Marvin E. Copple was a creditor of the said Paul L. Douglas, Respondent, in the amount of $105,600.00; that the failure of the said Paul L. Douglas, Respondent, to so report and disclose the said indebtedness [sic].
5. [Same as paragraph 5 of count II.]
COUNT V
1. That on or about April 20, 1977, the Respondent, Paul L. Douglas, borrowed from the Commonwealth Savings Company of Lincoln, the sum of $241,744.00; that said loan was thereafter extended and renewed until on or about August 30, 1979, when said loan was paid in full by the Respondent, Paul L. Douglas; that the said loan and the extensions and the renewals thereof were not made in the ordinary course of business.
2. Paragraph 2 of Count II is made a part hereof by reference, as if fully set out herein.
3. Paragraph 3 of Count II is made a part hereof by reference, as if fully set out herein.
4. That the Respondent, Paul L. Douglas, failed to report or to disclose the above-mentioned loan of April 20, 1977, and its subsequent renewals in the statements filed for the years 1977, 1978 and 1979.
5. [Same as paragraph 5 of count II.]
Count VI concerns certain legal services rendered by respondent to Marvin Copple and alleges, in pertinent part, as follows:
COUNT VI
1. That in the years 1978, 1979 and 1980, the Respondent, Paul L. Douglas, performed legal services for Marvin E. Copple in connection with the Timber Ridge Real Estate Development, and that in consideration of the above services, the said Marvin E. Copple paid to the Respondent, Paul L. Douglas, by his personal check the following:

 $ 5,000.00 on or about December
 19, 1978
 $ 5,000.00 on or about April
 13, 1979
 $ 7,500.00 on or about September
 5, 1979
 $15,000.00 on or about December
 24, 1980
 $ 5,000.00 in the year 1980 (exact
 date not given)
 __________
TOTAL - $37,500.00

2. Paragraph 2 of Count II is made a part hereof by reference, as if fully set out herein.

*534 3. Paragraph 3 of Count II is made a part hereof by reference, as if fully set out herein.
4. That in the statement filed by the said Paul L. Douglas, Respondent, for the calendar years 1978, 1979 and 1980, he failed to report or to disclose therein that he had received income of more than $1,000.00 in each of said years from the said Marvin E. Copple or from the Timber Ridge Real Estate Development, as herein alleged.
5. [Same as paragraph 5 in count II.]
A summary of these five charges is well set out at pages 51 and 52 of the referee's report, as follows:
Counts II through VI: Accountability and Disclosure Omissions
Counts II and III charge that the Respondent on his 1977 Statement of Financial Interests filed with the Nebraska Accountability and Disclosure Commission pursuant to Neb.Rev.Stat. § 49-1493 (Cum.Supp.1976) failed to identify Marvin Copple as a creditor to whom $1,000 or more was owed, despite the alleged debt arising, respectively, from the January 12, 1977 lot purchase agreement for $241,744 and from the September 8, 1977 lot purchase agreement for $320,755. Count IV charges Douglas omitted from his 1979 Statement of Financial Interests the name of Marvin Copple as a creditor with respect to the June 1, 1979 lot purchase agreement for $105,600. Count V charges the Respondent omitted from his Statements of Financial Interests for 1977, 1978 and 1979 the name of Commonwealth as a creditor, although during each of those years he owed Commonwealth $241,744 plus interest upon a loan extended April 20, 1977 and periodically renewed until repayment on August 30, 1979. Count VI charges that the Respondent on his 1978, 1979 and 1980 Statements of Financial Interests failed to disclose as additional income of $1,000 or more payments totalling $37,500 from Marvin Copple "in connection with the Timber Ridge Real Estate Development for `legal services' ".
As set out above, in each count the formal charge alleged the applicability of the Nebraska Political Accountability and Disclosure Act, §§ 49-1401 et seq. Section 49-1496 (Reissue 1978) of that act provided, in pertinent part, at the times in question, as follows:
49-1496. Statement of financial interests; form; contents; enumerated. (1) The statement of financial interests filed pursuant to sections 49-1493 to 49-14,104 shall be on a form prescribed by the commission.
(2) Individuals required to file under sections 49-1493 to 49-1495 shall file the following information for themselves:
(a) The name and address of and the nature of association ...;
(b) The name, address, and nature of business of a person from whom any income or gift in the value of one thousand dollars or more was received during the preceding year and the nature of the services rendered. If income results from employment by, operation of or participation in a proprietorship or partnership or professional corporation or business or nonprofit corporation or other person, the person may list the proprietorship or partnership or professional corporation or business or nonprofit corporation or other person as the source and not the patrons, customers, patients or clients of the proprietorship or partnership or professional corporation or business or nonprofit corporation or other person;
(c) The description, including nature and location of all real property except the residence of the individual, in the state, the fair market value of which exceeds one thousand dollars ...;
(d) The name and address of each creditor to whom the value of one thousand dollars or more was owed by the filer or a member of the filer's immediate family. Accounts payable, debts arising out of retail installment transactions or from loans made by financial institutions in the ordinary course of business, loans from a relative, and land contracts that have been properly recorded with the *535 county clerk or the register of deeds need not be included;
....
(f) Such other information as the person required to file the statement or the commission deems necessary, after notice and hearing, to carry out the purposes of sections 49-1401 to 49-14,138.
The individuals required to file statements under § 49-1496 specifically include the Attorney General of Nebraska, as set out in § 49-1493(1) (Reissue 1978).
In his brief at 21, respondent concedes "that if the Respondent's conduct in filing his reports with the Nebraska Political Accountability and Disclosure Commission constituted dishonesty, fraud, deceit, or misrepresentation, it might constitute grounds for discipline in the present proceedings irrespective of the statute's constitutionality." Respondent goes on to state: "However, in view of the unconstitutionality of the statute, that conduct must be evaluated on its own and such evaluation may not attribute any weight or degree of seriousness to the alleged violation of an unconstitutional statute."
Respondent attacks the constitutionality of the statute on the grounds that § 49-14,105 (Reissue 1984) provides that the Governor of the State appoints four members of the nine-member commission (and two of those appointments must be made from two lists submitted by the Legislature), while the Secretary of State appoints the other four appointed members (and two of those are from lists submitted by the Republican and Democratic state chairpersons). Respondent contends that the Legislature may not constitutionally encroach upon the executive branch, citing State ex rel. Beck v. Young, 154 Neb. 588, 48 N.W.2d 677 (1951), and Wittler v. Baumgartner, 180 Neb. 446, 144 N.W.2d 62 (1966).
This part of respondent's attack on the constitutionality of §§ 49-1401 et seq. was answered by a brief filed by the current Nebraska Attorney General. The Attorney General contends that the constitutionality of the act is irrelevant to a disciplinary proceeding and that the respondent has no standing to challenge it. We agree.
Respondent does not set out the basis of his standing to challenge the act. The matter before us is not confined to the question as to whether respondent has violated the act, but the matter of respondent's conduct.
We have previously addressed the issue of how the validity of a statute affects disciplinary proceedings against an attorney. In State ex rel. Nebraska State Bar Assn. v. Leonard, 212 Neb. 379, 322 N.W.2d 794 (1982), the court considered the discipline of an attorney who had entered a plea of nolo contendere to violation of a federal statute. It was noted by the referee that the statute in question was not actually in effect during the period of time charged in the attorney's indictment. Thus, as applied to the disciplined attorney, it could have been argued that the statute was an ex post facto law. The court stated at 383, 322 N.W.2d at 796:
The fact that the federal statute, which the respondent was charged with having violated, was an ex post facto law is not controlling in this proceeding for several reasons. It is the respondent's conduct or "actions" which is [sic] in issue rather than whether he was technically guilty of the crime charged. An attorney may be subjected to disciplinary action for conduct outside the practice of law for which no criminal prosecution has been instituted or conviction had. State ex rel. Nebraska State Bar Assn. v. Bremers, 200 Neb. 481, 264 N.W.2d 194 (1978).
The issue of the constitutionality or unconstitutionality of the Nebraska Political Accountability and Disclosure Act is irrelevant to the issues before us.
In Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the petitioners were charged with conspiring to defraud the government. Specifically, it was alleged that the petitioners filed false statements or affidavits in order to secure the services of the National Labor Relations Board. The petitioners contended that their convictions could not stand because the statute requiring the filing of *536 the statements or affidavits was unconstitutional as a bill of attainder. To this, the Court in Dennis replied at 384 U.S. at 865, 86 S.Ct. at 1846:
We need not reach this question, for the petitioners are in no position to attack the constitutionality of § 9(h). They were indicted for an alleged conspiracy, cynical and fraudulent, to circumvent the statute. Whatever might be the result where the constitutionality of a statute is challenged by those who of necessity violate its provisions and seek relief in the courts is not relevant here. This is not such a case. The indictment here alleges an effort to circumvent the law and not to challenge ita purported compliance with the statute designed to avoid the courts, not to invoke their jurisdiction.
Quoting Kay v. United States, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938), the Dennis Court stated at 384 U.S. at 866, 86 S.Ct. at 1847:
"When one undertakes to cheat the Government or to mislead its officers, or those acting under its authority, by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction."
In Dennis, the prosecution was for the petitioners' fraud. It was not an action to enforce the statute claimed to be unconstitutional. The same is true with the case at bar. It is a case directed at the respondent's actions, not a case to enforce the statute claimed to be unconstitutional.
"[O]ne who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself." United States v. Knox, 396 U.S. 77, 79, 90 S.Ct. 363, 365, 24 L.Ed.2d 275 (1969).
In the proceeding before us, relator is not trying in any way to charge respondent with any violation of the act, but has merely alleged that certain conduct of respondent has not measured up to the standard that our statutes have set for certain purposes. Respondent, of course, is in a particular situation where he, as the Attorney General of Nebraska, chose to comply with the act by making filings under the act. We hold that respondent has no standing to challenge the act's constitutionality in this proceeding and that we are judging his conduct in furnishing information to the public, as required by the act. If respondent has chosen to mislead the public by his filings under the act, we are not concerned with any violation of the act, but with his conduct in improperly informing, or in misleading, the public. In summary, this court, like the U.S. Supreme Court in the Dennis case, does not reach the question as to the constitutionality of §§ 49-1401 et seq., but we consider respondent's conduct under the act.
Section 49-1493 requires that the Attorney General shall "file with the commission a statement of financial interests as provided in sections 49-1496 and 49-1497...." Section 49-1496(2)(d) (Reissue 1978) provides:
The name and address of each creditor to whom the value of one thousand dollars or more was owed by the filer or a member of the filer's immediate family. Accounts payable, debts arising out of retail installment transactions or from loans made by financial institutions in the ordinary course of business, loans from a relative, and land contracts that have been properly recorded with the county clerk or the register of deeds need not be included.
The evidence shows that respondent and Paul Galter entered into three purchase agreements with Marvin Copple: (1) on January 12, 1977, in the amount of $241,744 (count II); (2) on September 8, 1977, in the amount of $320,755 (count III); and (3) on June 1, 1979, in the amount of $105,600 (count IV). The referee, at page 56 of his report, determined:
On their face, the purchase agreements appear to create a contractual obligation for the Respondent and Paul Galter to pay Marvin Copple the full purchase price upon the sale of the lots, issuance of building permits or expiration *537 of one year from the dates of the agreements. But the actual agreement between the parties to the contract was that no payment was necessary, including the down payment which the contracts recited had been paid but actually had not been, until Marvin Copple would sell a lot and the new purchaser would pay the money. At that point, according to the oral agreement between the parties and their course of conduct, Copple would deed the lot to the Respondent, the Respondent would sign a deed (prepared by Copple) to the new purchaser, the new purchaser would pay the Respondent, the Respondent would pay Copple the originally agreed-upon purchase price, and the Respondent and Paul Galter would split the profit from the sale. At least this was the procedure that was followed for the 40 lots covered by the September 8, 1977 agreement and the 12 lots under the June 1, 1979 agreement. These 52 lots all were sold to Judith Driscoll in two transactions. The original group of 26 lots were handled differently in that Marvin Copple arranged for Commonwealth to loan to the Respondent the agreed-upon purchase price for the 26 lots in exchange for a note made by the Respondent and guaranteed by Paul Galter and a mortgage. For these lots, Copple received full payment at the time of the loan and the Respondent repaid principal and interest to Commonwealth as Copple sold the lots to third parties, including eight lots sold to Driscoll. Thus, for the 26 lots, there was a real obligation and debt to Commonwealth. But for the 26 lots before the Commonwealth loan and the later groups of 40 lots and 12 lots, no current or binding obligation existed. Although the Commonwealth loan and the sales to Driscoll intervened before the one-year pay back provisions of the lot purchase agreements might have come into effect, there is no evidence to contradict the testimony of the parties to those agreements that the Respondent and Paul Galter would not have been obligated to pay had the lots not sold and that the parties could have changed the agreements to designate different lots, had they so chosen.
Thus, the agreement between the parties as it actually existed is consistent with the Respondent's position that no reportable debt to Marvin Copple existed with respect to the lots. I do not read the Act to require identification of a seller of property when the obligation to pay for it arises simultaneously with the transfer of title.
Turning first to the allegations of count II, the record shows the following. On January 12, 1977, respondent and Paul Galter signed a purchase agreement agreeing to purchase, from Marvin Copple, 26 described lots in a subdivision in Lancaster County, Nebraska. In the purchase agreement, the parties agreed that "[t]he total purchase price shall be the sum of $241,774.00 which the parties agree has been computed on the basis of one hundred Dollars ($100.00) per frontal foot for the real estate described above." In this provision, and in later provisions discussed, the underlined words were written, while the balance was preprinted.
The agreement acknowledges the seller's receipt of "One hundred Dollars ($100.00) per lot at the time of the execution of this agreement...." This receipted amount was not paid by buyers at the time the agreement was signed. The agreement further provided that the balance, plus interest at 8 ¾ percent per annum beginning 120 days after the agreement was executed, was due when the lots were sold, or when a building permit was obtained for a lot, "provided, however, that the full purchase price for each lot, plus interest ... shall be paid not later than Jan. 12, 1978."
The agreement further provided that Marvin Copple had "the right to sell, assign, pledge, encumber or hypothecate this Purchase Agreement." Marvin Copple did assign this agreement to the Commonwealth Savings Company on April 20, 1977. Respondent signed a mortgage and note to Commonwealth and on that date Commonwealth issued a check in the amount of $241,744 to respondent, Marvin E. Copple, and Paul Galter. Respondent and Galter *538 endorsed and gave the Commonwealth check to Marvin Copple.
In exchange, respondent testified, Marvin Copple gave respondent a deed to the 26 lots, and respondent gave the deeds to Commonwealth. These deeds are not in evidence as such, and the only information concerning the deeds exists in other documents respondent's 1977 income tax return (exhibit 19) and exhibit 58, a partial abstract as to the lots described in the three purchase agreements between Copple, respondent, and Galter. The 1977 tax return shows a sale of an undivided interest in 10 lots acquired on April 20, 1977, and an installment sale of 14 lots also acquired April 20. In each of those installment sales, one payment of $50 is indicated, resulting in a "reportable gain" of approximately $6 per lot. Exhibit 58 also shows that respondent received deeds to 12 lots from Copple and his wife on April 20, 1977, five separate deeds to five different lots later in 1977, and deeds to six other lots in 1978; three lots are unaccounted for. Respondent's 1979 income tax return showed a gain resulting from the sale of 10 lots that were acquired on April 20, 1977. The foregoing shows the confusion generated by the sloppy records of respondent, and results in this court, or any investigator of this whole situation, being unable to determine what actually occurred.
The specific allegations of counts II, III, and IV allege that respondent did not report an indebtedness to Marvin Copple in his statement of financial interests (hereinafter "disclosure report") forms filed with the State. For the years 1977 and 1978, the reports filed by respondent stated "None" in answer to the question in item 11 on the forms, "Name and Address of Each Creditor to whom the Value of $1,000 or More was Owed by You...." For the year 1979, respondent's report states "None" in answer to the question in item 10, "Creditors to whom $1,000 or More was Owed by You...." The referee determined that respondent's answers were not so incorrect as to be a violation of the disclosure act and that relator had failed to prove the charges against respondent in counts II, III, and IV.
The referee thus determined that respondent was entitled to state in his disclosure report that he was indebted to no one in excess of $1,000 in 1977, because the disclosure act does not require that a filer report the debt rising from a purchase if the "obligation to pay for it arises simultaneously with the transfer of title." We cannot agree with that conclusion.
The facts are undisputed. Respondent signed three purchase agreements, totaling $668,129. In return, Marvin Copple agreed to convey to respondent (and Paul Galter) specific real property. Respondent contends the transaction was only a way to compensate him for services rendered to Marvin Copple and did not create a debt from respondent to Copple.
Respondent's position flies in the face of the way he himself has treated the transaction, and in the face of the realities of the situation. To maintain his position, respondent must contend that the contract between him and Copple means nothing and that their unexpressed intention controls the language and effective meaning of the agreement. That is not the law in this state where third parties, other than the two contracting parties, are induced to rely on such written agreements. Others relied on the written contracts between respondent and Copple. In the case of the first 26-lot purchase agreement, Commonwealth, as assignee of the agreement, relied on the validity of the written agreement. In the other two purchase agreements, the U.S. Government and the State of Nebraska, as taxing authorities, relied on the agreements, and Nebraska is concerned, as a government entity relies on truthful information furnished to it as to the activities of its officials.
We have consistently held that an unambiguous contract is not subject to interpretation or construction and that courts are not free to rewrite a contract for parties or speculate as to terms which the parties have not seen fit to set out. T.V. Transmission v. City of Lincoln, 220 Neb. 887, 374 N.W.2d 49 (1985). We have stated that "a written contract expressed in unambiguous *539 language is not subject to interpretation or construction, and the parties' intention must be determined from its contents alone." Gilbreath v. Ridgeway, 218 Neb. 822, 826, 360 N.W.2d 474, 477 (1984). In this case, the contract between respondent and Copple is not ambiguous in any way. It was, in fact, written on a form used in the ordinary course of Copple's business to transfer lots. If respondent wanted to express another contractual arrangement, he was free to do so. Respondent was an experienced lawyer. It is difficult to find that respondent signed an assignable agreement that required him to pay substantial sums of money within 1 year unless he was willing to be bound by such promises.
The actual interpretation respondent placed on the agreements shows the same result. Respondent admits the agreements constituted the transfer of an interest in land by Copple to respondent by the fact respondent states in his disclosure reports that he has an interest in the land. At that point the land is a gift to him, or he owes someone for it. Respondent does not contend he paid for the land at the time the agreement was signed, nor does he contend it was a gift.
In his federal income tax returns for 1977 and 1979, respondent indicated a capital gains sale, with an acquisition date of the contract date. To adopt the referee's reasoning would mean that respondent could not use the contract date as a purchase date, but rather the date that Copple arranged for a sale from respondent to others. Respondent's obligation to Copple did not arise when respondent sold the property, but arose under the written agreement with Copple.
This holding that both respondent and Copple had rights and duties under the contract is clearly exemplified in the 26-lot transaction of January 12 and April 20, 1977. The agreement was actually assigned to a third party. There were no further provisions in the two later agreements that the same thing could not be done again. The possibility of third-party participation in the assignable contracts could not be ruled out by the respondent's oral assertions that he would not permit such assignment.
As set out in count II, respondent was indebted to Copple in 1977 in amounts greater than $1,000. He did not report such debts on his disclosure forms. We find that respondent is guilty of the charges set out against him in count II.
The same reasoning applies to the allegations in counts III and IV. We find respondent guilty of the charges set out against him in counts III and IV.
A different factual situation is set out in count V. It is undisputed that respondent did not list Commonwealth Savings Company as a creditor in his disclosure forms for the years 1977, 1978, or 1979; that he owed Commonwealth money in each of those years; and that there was a Commonwealth loan in 1977, as set out above in connection with the 26-lot purchase agreement in 1977.
Respondent did not report any Commonwealth loans on his disclosure reports. His reason was that in the instructions issued with the 1977 form, there was a proviso that loans of the following types need not be reported: "(b) ... Accounts payable, debts arising out of retail installment transactions or from loans made by financial institutions in the ordinary course of business, loans from a relative, and land contracts that have been recorded with the County Clerk or the Register of Deeds." A similar provision was in the 1979 instructions. These instructions relfected generally the provisions of § 49-1496(2)(d). Respondent contends any loans made by Commonwealth to him were made "by financial institutions in the ordinary course of business." The referee agreed with respondent's position and held that since the loans were made in the ordinary course of Commonwealth's business, respondent had no obligation to disclose them. Since we are judging respondent's conduct, the definition of "ordinary course of business" could refer to the lender's business, and we cannot say the respondent did not comply with the requirements of the disclosure act in this respect. We determine that respondent *540 is not guilty of the charges against him in count V.
A still different problem exists with regard to count VI. In that count, respondent is charged with failing to report income received from Marvin Copple in 1978, 1979, and 1980. Again, the facts are not in dispute. Copple, by five personal checks, paid respondent the total sum of $37,500 in those years. On his disclosure forms for those years, respondent did not report any income from Copple in any of those years. In the 1978 report, item 8 requested the following information: "Name, Address and Nature of Business of a Person from whom Any Income or Gift in the Value of $1,000 or More was Received During the Period of This Report and the Nature of the Services Rendered or Circumstances of Gift," and "Nature of Services Rendered...." Respondent answered this question, in part, "Foxhollow Development, 1200 Manchester Dr., Lincoln, NE 68528"; "Real Estate"; and described the services rendered as "Land Development."
In the 1979 and 1980 reports, item 6, entitled "Places of Employment & Business Associations," requested the following information: "Names and Addresses of Places of Employment and Businesses"; "Nature of Association (Specify: employee, owner, partner, director, officer, trustee.... See Instructions Item 6)"; and "If you received more than $1,000 from such sources, include nature of payor's business and services you rendered."
In the 1979 report, respondent furnished this requested information, in part, by setting out the name and address of places of employment as "Foxhollow Development, 1200 Manchester Dr., Lincoln, NE 68528"; in describing the nature of the association, replied, "Owner of certain lots"; and set out the nature of the payor's business as "Land development. Made judgement decisions and financial investments."
In the 1980 report, the same questions were answered: "Foxhollow Development, 1200 Manchester Dr., Lincoln, NE 68528"; the nature of association as "Real Estate Development"; and the nature of the payor's business in the same way as in 1979.
The instructions for answering item 8 in the 1978 report included: "(b) `Person' means a business, individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, labor organization, company, corporation, association, committee or any other organization or group of persons acting jointly."
The instructions as to how to respond to item 6 in the 1979 and 1980 reports included:
Business includes a government, political subdivision, body corporate and partnership, sole proprietorship, firm, enterprise, franchise, association, organization, self-employed individual, holding company, joint stock company, receivership, trust, activity or entity.

OWNER  applies to situations where the filer is the sole proprietor of a business. Under the column entitled "Names and Addresses of Places of Employment and Businesses," the filer's name, trade name or name in which he did business should be used.
The referee describes the charges in count VI as follows:
Like the other charges, Count VI alleges that the actions set out in the charge constitute a violation of the Respondent's oath of office as an attorney and violate DR1-102 of the Code of Professional Responsibility. That provision of the Code deals with violations of disciplinary rules, illegal conduct involving moral turpitude, dishonesty, fraud, deceit, misrepresentation, and any other conduct adversely reflecting on fitness to practice law. I fail to see how any of these characterizations could properly be placed on the Respondent's disclosure of his business associations and sources of income during 1978 through 1980. All but $7,500 of the $37,500 referred to in Count VI related to the Respondent's services in connection with the Fox Hollow development of Marvin Copple. Instead of listing the name of the developer, the Respondent listed the name of the development and the address which Marvin Copple used for his real estate development activities. I can see nothing dishonest, deceitful, or *541 otherwise malevolent about listing the development rather than the developer.
Only one of the checks from Copple related to his services on the Timber Ridge development rather than the Fox Hollow development. To be consistent, the Respondent should have listed on his 1979 Statement of Financial Interests the name of Timber Ridge Development or Marvin Copple's name as the developer to whom he rendered services. The Fox Hollow listing in 1979 is accurate because $5,000 was received during that year for services related to Fox Hollow. The question is whether the omission of the name of Timber Ridge or of Marvin Copple constitutes a violation of the Code. While the omission, strictly speaking, is inaccurate, I believe the purpose of the Act was fulfilled by disclosing involvement with another real estate development of Marvin Copple, listing Copple's business address, and disclosing in a general way his involvement in land development. I conclude that the omission of Timber Ridge or Marvin Copple from the 1979 statement cannot be characterized by reference to any of the language of DR 1-102.
Insofar as it is contended that respondent's conduct in the reporting of his financial activities in his filed disclosure forms cannot be considered as a violation of his oath of office as an attorney or the provisions of DR 1-102, we find that if such conduct constitutes "dishonesty, fraud, deceit, or misrepresentation" or "other conduct that adversely reflects on his fitness to practice law," it is sufficient to violate DR 1-102; or if such conduct results in a failure to "faithfully discharge the duties of an attorney and counselor," it is sufficient to violate respondent's oath as an attorney, as set out in § 7-104.
The referee found that respondent's "disclosure of his business associations and sources of income during 1978 through 1980" did not violate any of respondent's duties as set out above. We cannot agree.
Respondent's disclosure form for 1978 showed he received income greater than $1,000 from a "person" described as "Foxhollow Development." The statutory requirement is set out in § 49-1496(2)(b), and requires the filing of information as follows: "The name, address, and nature of business of a person from whom any income or gift in the value of one thousand dollars or more was received during the preceding year and the nature of the services rendered."
"Person" is defined in § 49-1438 as: "Person shall mean a business, individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, labor organization, company, corporation, association, committee, or any other organization or group of persons acting jointly." "Foxhollow Development" is not shown in the record before us as any of those. The clear, undisputed fact is that respondent received one check in the amount of $5,000 from Marvin Copple in 1978; received two checks in the total amount of $12,500 from Copple in 1979; and received two checks in the total amount of $20,000 from Copple in 1980. None of respondent's disclosure forms mention Marvin Copple.
The legislative findings and intent in enacting the Nebraska Political Accountability and Disclosure Act, §§ 49-1401 et seq., are set out, in pertinent part, in § 49-1402 (Reissue 1978), as follows:
(3) That it is essential to the proper operation of democratic government that public officials and employees be independent and impartial, that governmental decisions and policy be made in the proper channels of governmental structure, and that public office or employment not be used for private gain other than the compensation provided by law; and
(4) That the attainment of one or more of these ends is impaired when there exists, or appears to exist, a substantial conflict between the private interests of a public official and his duties as such official; and that although the vast majority of public officials and employees are dedicated and serve with high integrity, the public interest requires that the law provide greater accountability, disclosure, and guidance with respect to the conduct of public officials and employees.
*542 Section 49-1496 requires that the filer under the act set out the name of the person from whom more than $1,000 was received. If a public official receives such sums, that official has the obligation to publicly set out, in an appropriate disclosure form, the name of the person from whom the public official has received the money and, therefore, to whom the public official might be beholden. Respondent chose not to do so, but instead to say he has received money from "Foxhollow Development," an entity as to which he described, in his 1979 disclosure report, the nature of his association as "[o]wner of certain lots." In 1979, the instructions in connection with the disclosure form stated: "Item 6: ... Business Associations-Nature of Association: OWNER  applies to situations where the filer is the sole proprietor of a business. Under the column entitled `Names and Addresses of Places of Employment and Businesses,' the filer's name, trade name or name in which he did business should be used."
We find that respondent has failed to report income from Marvin Copple as he was required to do by § 49-1496(2)(b). Instead, respondent created the impression that he was engaged in a business from which he received income, and in 1979 described himself as an "owner"that is, giving the impression that he was the proprietor of Fox Hollow Developments. Respondent did not disclose he was an employee of Marvin Copple. Respondent explained his failure to list Marvin Copple as a person from whom he received income, in the hearing before the Committee on Inquiry of the Second Disciplinary District, as follows;
A I supposeFrom the questioning I'm getting, I suppose I should have listed M.E. Copple or Marvin Copple, 1200 Manchester Drive, Lincoln, Nebraska, real estate, and that would have solved all the problems.
I started outI wrote down Fox Hollow development at that address and I just stayed there. I didn'tIt wasn't as a matter to conceal or hide anything. I suppose I justI listed Fox Hollow development and just stayed with Fox Hollow development.
To this day, I don't find it that significant.
It wasn't a matter of trying to conceal or hide anything.
In our review, we determine that respondent's misrepresentation was significant and that respondent so conducted himself as to not truthfully answer the questions in the disclosure forms in order not to disclose his relationship to Marvin Copple. We find respondent guilty of the charges set out against him in count VI.

COUNTS VII, VIII, AND IX
These counts, which will be considered together, relate to false statements by the respondent to Richard Kopf, the special counsel to the Special Commonwealth Committee of the Legislature, concerning payments the respondent received from Marvin Copple and whether the respondent had paid income tax on the payments. The formal charges allege in pertinent part as follows:
COUNT VII
....
6. That in a letter to Richard G. Kopf dated February 6, 1984, the Respondent stated that he had been paid a total of $32,500.00 from Marvin E. Copple during the years 1978, 1979 and 1980. That at the time the Respondent made the above-mentioned assertions he knew the same to be false.
7. That the actions of the Respondent, as set forth above, constitute a violation of his Oath of Office as an attorney licensed to practice law in the State of Nebraska, as provided by Section 7-104 R.R.S.1977, and are in violation of the following provisions of the Code of Professional Responsibility, [previously set out].
COUNT VIII
....
5. That on February 25, 1984, the Respondent testified under Oath before the Special Commonwealth Committee of the Legislature of Nebraska.
6. That during his above-mentioned testimony the Respondent stated that he had received payments totaling $32,500.00 from Marvin E. Copple. That at *543 the time the Respondent made said statements he knew the same to be false.
7. That the actions of the Respondent, as set forth above, constitute a violation of his Oath of Office as an attorney licensed to practice law in the State of Nebraska, as provided by Section 7-104 R.R.S. 1977, and are in violation of the following provisions of the Code of Professional Responsibility, [previously set out].
COUNT IX
....
5. That on February 25, 1984, the Respondent testified under Oath before the Special Commonwealth Committee of the Legislature of Nebraska.
6. That during his above-mentioned testimony the Respondent stated that he had paid income tax on all of the payments he received from Marvin E. Copple. That at the time the Respondent made said statements he knew the same to be false.
7. That the actions of the Respondent, as set forth above, constitute a violation of his Oath of Office as an attorney licensed to practice law in the State of Nebraska, as provided by Section 7-104 R.R.S.1977, and are in violation of the following provisions of the Code of Professional Responsibility, [previously set out].
Count VII charges that in a letter to the special counsel of the Special Commonwealth Committee of the Legislature, respondent stated that he had been paid a total of $32,500 by Copple during 1978, 1979, and 1980, and that he knew the statement was false. Count VIII charges that in testimony before the legislative committee he said he received payments totaling $32,500 from Copple, knowing the statement to be false. Count IX charges that in testimony before the legislative committee respondent said he had paid income tax on all of the payments he received from Copple, knowing the statement to be false. Briefly, it is charged that the false statements violate his oath of office as an attorney and DR 1-102(A)(4), in that they amount to fraud, deceit, misrepresentation, and conduct adversely reflecting on respondent's fitness to practice law.
In his 1980 federal income tax return, respondent showed income of $15,000 as a management fee, but another $5,000 payment from Copple, in the form of one check, was not shown. Respondent testified that in drafting the letter to the special counsel and in preparation for testimony before the legislative committee he relied upon his income tax returns; that the omission of $5,000 from the 1980 return was inadvertent, the result of poor recordkeeping; and that later he learned of the omission from a newspaper article published following the 1984 perjury indictment, listing the payments he had received from Copple. He then looked through his bank records and found a $5,000 deposit corresponding to the payment, and filed an amended return for 1980, declaring the additional $5,000. The $5,000 check was one of five received from Copple. The others were reported on his tax returns.
The referee properly determined that the counts could not be sustained unless the relator proved by a clear preponderance of the evidence that respondent knew his statements were false at the time he made them. It is reasonable that in writing the letter to the special counsel and preparing for his testimony, respondent would consult his tax returns as the most convenient source and the ultimate distillation of many records. Pointing to the absence of countervailing evidence, the referee accepted respondent's version.
The cause is for trial de novo in this court, but we recognize that the referee heard and saw the witnesses and his findings must necessarily be considered on matters that are in irreconcilable conflict. State ex rel. Nebraska State Bar Assn. v. Jensen, 171 Neb. 1, 105 N.W.2d 459 (1960).
Although the omission to declare as much as $5,000 in a tax return is suspect on its face, there was a trail of business records that could easily be picked up by the Internal Revenue Service in the slightest investigation. This seems inconsistent with a studied concealment. We believe that it is unlikely that respondent hoped to frustrate the investigation or diminish his *544 role by intentionally omitting mention of an additional $5,000 payment.
Respondent treated lot sales as capital transactions, and not as compensation. By offsetting capital gains from total lot sales against a capital loss carryover, he was able to save over $8,000 in federal and state income taxes. The referee noted that a liberal reading of count IX might allow consideration of the tax issue. However, he observed that at the hearing the relator drew no connection between the tax treatment of lot sales and count IX, and the referee felt it would be unfair to read count IX as doing so. The relator's brief in this court made no such contention. We decline to interfere with the referee's conclusion.
We find that counts VII, VIII, and IX have not been established by clear and convincing evidence.

COUNT XI
This count relates to the respondent's alleged use of his office for the benefit of a private client, the questionable nature of transactions in which he was involved with Marvin Copple, the conflict of interest that developed as a result of his transactions with Marvin Copple while the respondent was the Attorney General of the State of Nebraska, his failure to disclose the nature and extent of these activities, and his failure while Attorney General to promptly withdraw from all matters relating to the Commonwealth Savings Company.
Count XI of the formal charges alleges in pertinent part as follows:
3. That from January, 1975 and at all times material hereto Respondent was the duly elected Attorney General of the State of Nebraska and charged with the duties and responsibilities specified by Reissue Revised Statutes of 1943, Section 84-201 et seq.; that as Attorney General was head of the executive department of state government "known as the Department of Justice"; that as head of the Department of Justice Respondent had "general control and supervision of all actions and legal proceedings in which the State of Nebraska may be a party or may be interested" and had "charge and control of all the legal business of all departments and bureaus of the state, or of any office thereof, which requires the services of attorney or counsel in order to protect the interests of the state" (R.R.S.1943, Section 84-202); that included in those departments and bureaus was the Department of Banking and Finance (R.R.S.1943, Sections 8-101 et seq.)
4. That from and after 1953 and at all times material hereto Respondent was an attorney admitted to practice law in Nebraska; that accordingly Respondent was a part of the judicial system of this State and an officer of the Courts of this State and subject to the Rules of Discipline adopted by the Supreme Court of this State.
5. That among the Rules of Discipline [Code] adopted by the Supreme Court of this State is DR 1-102 which provides:
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
6. That DR 1-102 was in full force and effect at all times material hereto.
7. That during the years 1976 through 1983 inclusive Commonwealth Savings Company was an industrial loan and investment company organized under the laws of the State of Nebraska and subject to "general supervision and control" by the Department of Banking and Finance, State of Nebraska (R.R.S. 1943, Section 8-401, et seq.); that during some or all of these years Marvin Copple was a real estate developer in Lincoln, Nebraska and an officer or director of Commonwealth Savings Company and the son of S.E. Copple, who was president of such institution; and that during some or all of these years Judith Driscoll, a/k/a J.E. Driscoll, was Marvin Copple's personal secretary or employee.
8. That during the years 1976 through 1983 inclusive Respondent engaged *545 in a course of conduct violative of DR 1-102 in that he:
A. Undertook to provide legal or consulting services to Marvin Copple in the development of proposed subdivisions to the City of Lincoln known as Fox Hollow, Fox Hollow First, Fox Hollow Second and Timber Ridge, which included using his personal contacts with government officials or other prominent persons developed through his years of public service to:
1. Expedite the condemnation of an easement across property adjacent to that known as Fox Hollow to provide sewer service to such property.
2. Secure approval of the City of Lincoln for the installation of utilities at Fox Hollow by Executive Order.
3. Negotiate with the Army Corps of Engineers in regard to problems involving surface flowage easement across portions of Fox Hollow.
4. Protect the interest of Fox Hollow from adverse consequences of condemnation proceedings for construction of a high voltage transmission line.
5. Contact a high ranking officer at SAC Headquarters to secure written confirmation of proposed modification in military aircraft to reduce their noise levels to impeach or challenge the so-called ANCLUC study, which impeded the rezoning and development of Timber Ridge.
B. Engaged in questionable real estate transfers and loan activities with Marvin Copple, Judith Driscoll and Commonwealth Savings Company for the ostensible purpose of obtaining compensation for such services thereby facilitating the flow of Commonwealth Savings Company funds to Marvin Copple in exchange for title to or a security interest in Fox Hollow lots and compromising his ability to perform the duties of his office in regard to providing legal assistance to the Department of Banking in the investigation and prosecution of persons, including his client Marvin Copple, who allegedly had engaged in illegal acts which had impaired or contributed to the impairment of the financial solvency of Commonwealth Savings Company.
C. Failed to provide a full and complete disclosure of the nature and extent of these activities to the Director of the Department of Banking and Finance and the Governor of Nebraska when circumstances developed in regard to the insolvency of Commonwealth Savings Company which made such a disclosure necessary to protect the administration of justice and to secure public confidence in the fairness and adequacy of law enforcement officials and procedures in the State of Nebraska and particularly the office of Attorney General.
D. Failed to promptly disqualify himself from handling the legal business of the Department of Banking and Finance of the State of Nebraska in regard to the Commonwealth Savings Company matter when he knew or should have known that his failure to so act would impair public confidence in the administration of justice in the State of Nebraska and would be prejudicial to the administration of justice.
E. Failed to make a full and fair disclosure of these matters when requested to do so by Special Assistant Attorney General David Domina in November and December of 1983.

Subsection 8A
Subsection 8A alleges that the conduct of respondent in providing legal and consulting services to Marvin Copple in certain real estate developments violated disciplinary rules, DR 1-102(A)(1), which conduct was prejudicial to the administration of justice, DR 1-102(A)(5). Particularly applicable is the following disciplinary rule: "DR 8-101 Action as a Public Official. (A) A lawyer who holds public office shall not:... (2) Use his public position to influence, or attempt to influence, a tribunal to act in favor of himself or of a client."
That rule is explained in EC 8-8: "A lawyer who is a public officer, whether full or part-time, should not engage in activities in which his personal or professional interests are or foreseeably may be in conflict with his official duties."
*546 Although there is some evidence to support the allegations contained in subsections 8A(1), (2), (3), (4), and (5), we find that part of the charge was not proven by clear and convincing evidence.
As part of its case, relator adduced evidence concerning respondent and an Air Force officer. Exhibit 35 is a letter signed by Air Force Col. John R. McKone, commander of Offutt Air Force Base, Omaha, Nebraska, addressed to "The Honorable Paul Douglas, Attorney General, State of Nebraska," listing several questions about military flights into the Lincoln airport that had been posed to the Air Force by the "Honorable Paul Douglas." Respondent explained that the letter was a response to his telephone call to McKone, whom he had met at a reception. In the telephone call, respondent said, he had explained that he was privately employed and that land being developed by a private developer was affected by the noise of night flights of military planes into and over the airport; respondent asked questions about the flights, and the letter was McKone's response.
Although some of the details of the professional and business relationship between respondent and Marvin Copple raise questions concerning the propriety of respondent's acts, there is no clear and convincing proof that such acts, legal services, and relationships, at the time performed were in conflict with either his duties as a lawyer under the Code or his duties as Attorney General, to the end that they were prejudicial to the administration of justice. We therefore find that the referee properly found that this part of the charge in subsection 8A had not been proven.
However, that is not to say that the evidence supporting the allegations in subsection 8A does not support the charges in subsection 8D, particularly since the respondent's status of confidentiality with his client Copple continued after the termination of the attorney-client relationship. See, DR 4-101(B), "A lawyer shall not knowingly: (1) reveal a confidence or secret of his client"; EC 4-6, "The obligation of a lawyer to preserve the confidences and secrets of his client continues after the termination of employment." See, also, Neb.Rev.Stat. § 7-105(4) (Reissue 1983).

Subsection 8B
Subsection 8B alleges conduct involving dishonesty, fraud, deceit or misrepresentation that was prejudicial to the administration of justice, and that such conduct was in conflict with respondent's duties as Attorney General in the full investigation of the Commonwealth matter.
The transactions between the respondent and Marvin Copple in which Commonwealth Savings Company was involved were characterized by deception and subterfuge. On their face, the purchase agreements, notes, mortgages, and other documents purported to be binding obligations which created indebtedness on the part of the respondent and his associate, Paul Galter. The respondent, however, contends that these were merely devices by which he would be compensated by sharing in the profit or gain when the property was eventually sold, and that the instruments did not really represent a present indebtedness. Yet the April 20, 1977, promissory note and mortgage in the amount of $241,774 to Commonwealth was the device by which Copple obtained that amount from Commonwealth for his own benefit. The respondent signed the note and mortgage and endorsed the Commonwealth check to Copple, and when these transactions were reported for tax purposes, they were treated as capital transactions in which the gain or loss was claimed as a capital gain or loss.
By engaging in the various transactions that the respondent had with Copple, the respondent facilitated the flow of funds from Commonwealth to Copple through the use of documents which the respondent claims were not what they appeared and purported to be. Although the respondent himself may not have personally profited greatly from these transactions, they enabled Copple to extract large sums of money from Commonwealth when it in fact was in a precarious financial condition.
We find that the respondent, by these transactions, engaged in conduct involving deceit and misrepresentations, in violation *547 of DR 1-102(A)(4), for which he is subject to discipline.

Subsections 8C and D
Since the issues of disclosure alleged in subsection 8C and disqualification alleged in subsection 8D are closely related conflict-of-interest issues, they are considered together. Both relate to Canon 5 of the Code, "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." The alleged conflicts emerged during the investigation by the Department of Banking of insolvent industrial loan companies, including Commonwealth. Briefly, the conflicts directly involved respondent, with his 1976 to 1981 active attorney-client relationship with Marvin Copple, and their personal business associations; and, indirectly, the conflicts involved both Marvin Copple and Commonwealth as a result of Copple's history as a onetime Commonwealth officer and sometime borrower of large sums of money from Commonwealth under irregular circumstances, and the $500,000 payments made to Marvin Copple in 1981.
In 1980 and 1981, Marvin Copple was promoting the purchase of the Stettinger property, which Commonwealth eventually bought and paid Copple a $500,000 fee in two equal $250,000 checks, on January 15 and April 2, 1981. When this information was given to respondent by Barry Lake in May 1983, Lake described it in terms of "theft." That description should have put respondent on inquiry concerning a conflict. Reasonable inquiry by respondent would have shown that Copple had received the two payments, and would have shown other attendant circumstances. Respondent did nothing. In addition, he did not disclose to the interested State officials of his past personal, business, and lawyer-client relationships with Copple. Although the record does not show that respondent performed any legal services for Copple as to the Stettinger tract, he was performing legal services for Copple on other real estate promotions during this 1981 period.
Conflicts have long been the concern of lawyers. When the Nebraska Bar was integrated in 1937, Canon 6 of the Canons of Professional Ethics provided:
It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.
The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.
The terms "conflict" and "conflict of interest" do not appear as such in a Code rule; rather, they are referred to in the Code as "differing interests," and defined to include every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest.
During this 1976 to 1981 period there were these three general conflict situations presented to respondent, as a lawyer, for his consideration and resolution.
First: At the time when respondent became counsel for Copple in 1976, he had a possible conflict of interest, as described in DR 5-105(A):
A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105(C).
Under those circumstances, and considering applicable statutes and rules, respondent had no clear conflict by accepting employment. See Adams v. Adams, 156 Neb. 778, 58 N.W.2d 172 (1953).
Second, after respondent accepted multiple employment, which was the 1976 to the end of the 1981 active employment period, he had a continuing possible conflict of *548 interest, due to the application of DR 5-105(B).
A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105(C).
DR 5-105(C), which refers to consent, is not applicable to a public officer. State ex rel. Nebraska State Bar Assn. v. Richards, 165 Neb. 80, 84 N.W.2d 136 (1957).
There was a close fact question whether the conflicts from multiple employment (State of Nebraska duties versus Marvin Copple confidences) during this 1976 to 1981 period prevented respondent from exercising independent judgment. We conclude that we cannot say that such a conflict was clearly shown from the evidence.
Third, in 1983, after termination of the multiple employment in 1981, a conflict of interest did arise when the respondent learned that Marvin Copple was suspected of the theft of money from Commonwealth. The exercise of independent professional judgment by the respondent on behalf of the State was adversely affected by his past lawyer-client relationship with Copple. EC 5-1 provides in part: "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties." See, also, § 7-105(4). To the same effect as previously noted, DR 4-101(B)(1) and EC 4-6 provide that the obligation of a lawyer to preserve the confidences and secrets of his client continues after the termination of the employment.
In the text C. Wolfram, Modern Legal Ethics § 7.4 at 358 (West 1986), the author states:
Under the doctrine that has prevailed, any claim that a lawyer is disqualified because of a former-client representation must satisfy the two criteria of the substantial-relationship test. First, the former representation and the present one must be adverse in some material way. Second, the matters must be substantially related.
The Code has one rule that requires withdrawal:
DR 2-110 Withdrawal from Employment.
....
(B) Mandatory withdrawal.
... [a] lawyer representing a client in other matters shall withdraw from employment, if:
....
(2) He knows or it is obvious that his continued employment will result in violation of a Disciplinary Rule.
The following are applicable as guides concerning disclosure and disqualification:
EC 5-14 Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client....
EC 5-15 If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation....
EC 5-16 In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires....
EC 5-19 A lawyer may represent several clients whose interests are not actually or potentially differing. Nevertheless, he should explain any circumstances that might cause a client to question his undivided loyalty. Regardless of the belief of a lawyer that he may properly represent multiple clients, he must defer to a client who holds the contrary belief and withdraw from representation of that client.
As the details of the banking department investigation of Commonwealth became known to respondent, his prior business *549 and lawyer-client relationships with Marvin Copple came into sharp focus as conflicts of interest highlighted by (1) Copple's receipt of the illegal $500,000 fee from Commonwealth in early 1981, described by Barry Lake as amounting to theft; (2) respondent's own personal knowledge and experience of borrowing large sums of money from Commonwealth in real estate developments with Copple, where the procedures were suspect; (3) the contents of the March 10, 1983, letter from the FBI to Paul Amen that was received by respondent; and (4) confirmation, in June 1983, from Ruth Anne Galter, assistant attorney general, to respondent that there was merit in Lake's report that Marvin Copple may have stolen money from Commonwealth.
Respondent contends that Lake did not tell him all of the facts about the amount of money that Copple was alleged to have stolen, but, rather, "he told me that they were doing some investigation into a matter and that Marv Copple may have stolen or got money by theft from Commonwealth." However, respondent made no inquiries to determine the facts of this allegation.
It was not enough for respondent to tell Lake that he had prosecuted friends before and if Copple was involved in a crime he would be prosecuted.
Respondent also contends that during this 1982 to 1983 investigation period, he had no duty to either disclose or disqualify because (1) there was statutory authority and interoffice policy that the Attorney General would neither conduct an investigation of an institution then under investigation by the banking department nor institute prosecution of a person that was a part of such investigation until requested to do so by the banking department, and he had received no such request; (2) Paul Amen had directed that respondent take no action since it might "blow the lid off" and destroy the whole industry; and (3) respondent had assigned Ms. Galter to assist in the Commonwealth investigation. These facts were true; however, they do not negate his duties to disclose and disqualify under the Code.
During this time there was deep concern by the Director of Banking and Governor Robert Kerrey for the survival of the whole industrial loan industry in Nebraska. Key decisions were being made resulting from conferences between those officials and others, including respondent in his role as Attorney General. It was necessary, and those decisionmakers were interested in the subject matter and expected respondent to contribute his independent judgment (Canon 5). Yet respondent did not disclose to these officials his past relationships with Marvin Copple and business associations with Commonwealth, and he did not disqualify himself as Attorney General until November 18, 1983. Governor Kerrey testified that if he had known about respondent's relationships, he would have requested an investigation by some person other than respondent. In disposing of count I, we said, "where one has a duty to speak, but deliberately remains silent, his silence is equivalent to a false representation." That same rationale is applicable here. Respondent had a duty to make a full and truthful disclosure to the interested State officials concerning the nature of his conflicts. His silence was a clear violation of the Code requiring disclosure, without regard to whether or not the outcome of pending or future official investigations would have been changed, and was tantamount to a false representation that there was no conflict.
From the clear and convincing evidence, we conclude, contrary to the finding of the referee and his reliance on Adams v. Adams, 156 Neb. 778, 58 N.W.2d 172 (1953), that when respondent was first advised by Lake that Marvin Copple may have stolen money from Commonwealth, respondent clearly had a duty to disclose to the Director of Banking and to Governor Kerrey the existence of his prior lawyer, business, and personal relationships with Marvin Copple, and also his real estate loan history with Commonwealth. Further, respondent had conflicts in the whole Commonwealth investigation that were adverse in a material way and substantially related, to the end that he had a duty to disqualify himself as Attorney General no later than July 1, 1983, which was a reasonable time after Ms. Galter had confirmed in June *550 1983 that there was merit in the allegation that Marvin Copple had taken money illegally from Commonwealth. Having failed to disqualify himself until November 18, 1983, respondent violated the Code, and he is subject to discipline.
Respondent contends that under subsection 8D of count XI, the relator was required to show that his failure to disqualify himself "would impair public confidence in the administration of justice in the State of Nebraska and would be prejudicial to the administration of justice."
"`Violation of any of the ethical standards relating to the practice of law, or any conduct of an attorney in his professional capacity which tends to bring reproach on the courts or the legal profession, constitute [sic] grounds for suspension or disbarment.' " State ex rel. Nebraska State Bar Assn. v. Strom, 189 Neb. 146, 151, 201 N.W.2d 391, 393 (1972). The conduct of a government attorney is thus required to be more circumspect than that of a private lawyer. This is the inevitable result of the fact that government attorneys are invested with the public trust and are more visible to the public. As such, improper conduct on the part of a government attorney is more likely to harm the entire system of government in terms of public trust. Matter of Petition for Review of Opinion No. 569, 103 N.J. 325, 511 A.2d 119 (1986).
In Howell v. State, 559 S.W.2d 432, 436 (Tex.Civ.App.1977), the court defined "prejudicial" as meaning "tending to injure or impair; detrimental; harmful; hurtful; [or] injurious," and held that "[c]onduct prejudicial to the administration of justice may consist of any one or more of many acts too numerous to list."
In State v. Nelson, 210 Kan. 637, 504 P.2d 211 (1972), the court held that the term "prejudicial" is a word found universally throughout the legal and judicial system and is defined as hurtful, injurious, or disadvantageous.
The failure of respondent to make the required disclosures to the State officials responsible for making major decisions affecting the banking industry and the whole State of Nebraska was compounded by his failure to disqualify himself prior to July 1, 1983. Together, the confidence of the public was impaired, and the effect was an impairment of the administration of justice.

Subsection 8E
This general allegation relates to the November 25, 1983, letter sent by David Domina, special assistant attorney general (appointed by respondent on November 18, 1983, to handle all matters relating to Commonwealth), to respondent, requesting full information concerning respondent's relationships with Marvin Copple and Commonwealth. Instead, respondent's statements under oath were taken November 30 and December 12, 1983.
By the investigative nature of the statements, we see the main issue here as the duty of respondent to tell the truth. That general issue has been discussed in relation to count I. For that reason, subsection 8E does not require further discussion.

DISCIPLINE TO BE IMPOSED
Having determined that the respondent is subject to discipline, the remaining issue is to determine what discipline is appropriate under the facts and circumstances of this case.
As we stated in State ex rel. Nebraska State Bar Assn. v. Cook, 194 Neb. 364, 232 N.W.2d 120 (1975):
The determination of what is appropriate discipline in this case is not without difficulty. Many matters must be considered. These include the nature of the offenses, the need for deterrence of similar future misconduct by others, maintenance of the reputation of the bar as a whole, protection of the public and clients, the expression of condemnation by society on moral grounds of the prohibited conduct, and justice to the respondent, considering all the circumstances and his present or future fitness to continue in the practice of law. Drinker, Legal Ethics (1963), pp. 48, 49; State ex rel. Spillman v. Priest, 123 Neb. 241, 242 N.W. 433 [1932]; In re Dreier, 258 F.2d 68 [3rd Cir.1958]; State ex rel. Nebraska State Bar Assn. v. Butterfield, *551 supra; State ex rel. Nebraska State Bar Assn. v. Mathew, 169 Neb. 194, 98 N.W. 2d 865 [1959]; State ex rel. Nebraska State Bar Assn. v. Strom, 189 Neb. 146, 201 N.W.2d 391 [1972].
Id. at 384, 232 N.W.2d at 130.
The purpose of a disbarment proceeding is not so much to punish an attorney as it is to determine, in the public interest, whether he should be permitted to continue to practice law. State ex rel. Nebraska State Bar Assn. v. Wiebusch, 153 Neb. 583, 45 N.W.2d 583 [1951].
State ex rel. Nebraska State Bar Assn. v. Rhodes, 177 Neb. 650, 660, 131 N.W.2d 118, 125 (1964).
The following matters are of importance in determining the discipline which should be imposed. The record does not show any history of prior violation of respondent's oath as an attorney or of the Code of Professional Responsibility. Insofar as this court is informed, until his involvement with Marvin Copple and the Commonwealth Savings Company, the respondent served honorably as the Attorney General of this state.
It must be recognized that no contention is made that the respondent was responsible for the collapse of Commonwealth Savings Company, and no proceeding has established such responsibility. Although respondent entered into transactions with Copple which resulted in personal gain to the respondent, and those transactions enabled Copple to drain funds from Commonwealth at a time when it was in precarious financial condition, the role of the respondent was relatively minor so far as Commonwealth was concerned.
More serious is the fact that the respondent entered into improper transactions with Copple and Commonwealth, which later necessitated his withdrawal from any matters involving Commonwealth at a time when his services were most urgently needed by the State and its Department of Banking.
As we stated in the Cook case, 194 Neb. at 387, 232 N.W.2d at 132:
A judgment of permanent disbarment is a most severe penalty, as anyone who is dependent upon some special skill or knowledge for his own livelihood will quickly recognize if he contemplates for a moment the impact of being deprived by judicial fiat of the use of that skill and knowledge. Disbarment ought not to be imposed for an isolated act unless the act is of such a nature that it is indicative of permanent unfitness to practice law.
Furthermore, we believe there is little likelihood of repetition of unethical conduct by the respondent in the future.
We conclude that the appropriate discipline in this case is suspension from the practice of law for a period of 4 years commencing December 20, 1984.
During the period of suspension the respondent shall not engage in the practice of law in any manner whatsoever in this or any other jurisdiction; shall not engage in any conduct which would subject him to discipline under the disciplinary rules if he were engaged in the practice of law; and shall comply fully with the judgment in this proceeding.
Costs of this proceeding, in the amount of $36,028.94, are taxed to the respondent. All costs except the respondent's docket fee, in the amount of $50, having been paid by the relator, the respondent shall reimburse the relator directly in the amount of $35,978.94.
JUDGMENT OF SUSPENSION